## BORDEN'S FARM PRODUCTS CO., Inc., v. TEN EYCK et al.

District Court, S. D. New York.
July 26, 1935.

Walter E. Hope, of New York City, for plaintiff.

Samuel Kramer, of New York City, for Attorney General and District Attorney.

Henry S. Manley, of Albany, N. Y., for Commissioner and Director.

Before L. HAND, Circuit Judge, and GODDARD and COXE, District Judges.

L. HAND, Circuit Judge.

This is the same suit as Borden's Farm Products Co. v. Baldwin (D. C.) 7 F. Supp. 352, new defendants having been substituted. In accordance with the directions of the Supreme Court (293 U. S. 194, 55 S. Ct. 187, 79 L. Ed. 281), the evidence has now been heard at great length by a special master, who has made findings of fact, has concluded as matter of law that the statute is unconstitutional and has recommended that the defendants be enjoined. It is not necessary for us to repeat the general background of the case; it is contained in the opinion of the Supreme Court; what we have to say is merely in amplification of what was there left open. It now appears that before the agitation which led to the prohibition of the sale of "loose" milk to stores, the "independents" had usually sold bottled milk to stores at 1 cent a quart less than "advertised" dealers, and "loose" milk at from half a cent to a cent and a half less. In spite of this the four advertised companies had about one-third of the "wholesale" business, much the greater part of which was "loose" milk. The "independents" were able to undersell in this way because they sold nothing but fluid milk, while a fifth of the "advertised" companies' purchases were sold in the form of "surplus products," which fetched less in a market subject to wider competition. In November, 1931, the report of the commission in this city recommended that the sale of "loose" milk to stores be stopped, and at once began a scramble for the prospective increased bottle market, which demolished the old prices and led to unrestrained price-cutting. The following eighteen months were therefore abnormal, and the legislature might well have thought, —as we should have thought in its place,—

that a more reliable indication of the comparative command of the market by the "independents" and "advertised" dealers, was to be found before the industry had been faced with so critical a change. It is true that in July, 1931, the plaintiff and Sheffield Farms abandoned the charge of 5 cents for bottles and this continued until the autumn of 1932; it was equivalent to a reduction in price of 2 cents and therefore more than offset the usual differential of the "independents." Although the defendants insist that this bottle charge amounted to less, there is evidence to sustain the finding and we see no reason to upset it. Moreover, on the defendants' own calculation the charge came to a cent and a quarter, which was more than the differential. It must be owned therefore that for five months before the prospective abolition of "loose" milk appeared to complicate the situation, the differential had been variable or had disappeared. Yet even though this period be added to the "chaos" which followed November 1, 1931, there remained a substantial time before July, 1931, and after the autumn of 1932 when the "advertised" brands were apparently able to hold their own at the advance of a cent above the others. The public had come to prefer "advertised" brands, being convinced perhaps by the very advertisements of the plaintiff, which extolled their superior purity. Commercially the brands had come to mean a better grade of milk, for the hygienic properties of a product do not fix its commercial quality, but the opinion in which buyers hold it. When the legislature therefore came to fix minimum prices in the spring of 1933, it was faced with the fact that there were two grades of milk on the market, in addition to the admitted grades, "A" and "B."

The plaintiff has apparently assumed that this finding is critical in the sense that if it is not true the law cannot stand; hence much of the controversy has centered upon it. That is not so. The issue is not to be treated as the issues in an ordinary suit inter partes, where the court not only selects the applicable legal rules or doctrines, but also determines the issues of fact, as to which its power is immediate, plenary and absolute. It is otherwise when it undertakes to determine whether a statute violates the "due process" clause. We are indeed all familiar with the doctrine that a court will not then substitute its own opinion of what conduces best to the public welfare; there is a large demesne in which the legislative choice between conflicting social values is final, and courts undertake to intervene only when it appears beyond peradventure that that choice has not been defensible. All this is horn-book law and needs no citation; but so far as we can find, the question comes up for the first time whether when the court has undertaken an inquiry as to the facts on which the validity of a statute turns, the result is dependent upon its decision in the same sense as the result of an ordinary suit. If it finds to its own satisfaction that the necessary facts do not exist, is the law invalid? Or must it go further, as in the case of the choice of values, and find not only that the facts did not exist, but that reasonable people could not believe that they did? The question has an especial importance, because the Supreme Court has announced in this very case that the procedure here adopted ought to be generally followed. It seems to us that there can be no doubt that the second is the only tolerable doctrine. Otherwise the legislature's power would in effect be merely to enact general hypothetical propositions, which would become imperative only in case courts concluded that the facts on which their applicability depended, actually existed. That is certainly not the traditional limit of a legislature's powers; frequently it institutes elaborate inquiry to learn the truth, just as it did in this case. The inquiry and its result are a part of its function, as exempt from judicial review as its social choices. If it has proceeded by commission or the like, the result may be more impressive, but it need not so proceed, and courts are as much bound in the one case as in the other. Therefore it is not necessary for the defendants to demonstrate the truth of the finding as to the differential or of the other findings, though incidentally we think that they are true. The relevant inquiry as to each is not what the master or we, or even the Supreme Court, may think the truth to have been, but whether reasonable people might have taken the view of the legislature. For this reason findings favorable to the statute are in substance conclusive, even if we should not ourselves agree with them; for they prove that the legislature in assuming the truth of what they declare, at least had reasonable warrant, and that, as we have said, is enough, just as it is in the case of a verdict, or of the findings of an administrative tribunal.

The Pitcher Report had indeed recommended minimum prices and had not suggested the need of protecting the "independents." That meant nothing; the effect upon them of fixing a minimum might not yet have been realized. The bill originally did not include any price fixing at all; and the "independents" had no reason for alarm; but it was amended during its passage and with the introduction of a flat price they were naturally aroused and appealed for relief. Why there should be anything sinister about their success, passes our understanding. It is exactly to weigh the two sides of such a controversy that legislatures exist; a priori at least, we cannot see why the plaintiff's interest should be more precious to the public than its competitors', assuming that somebody's ox was bound to be gored. It is then argued that a differential was inconsistent with price fixing. This is true enough when there are no differences in quality, but nobody has ever supposed that prices should not be stepped to measure grades. Otherwise the whole demand seeks the better grade and the poorer is not sold at all. Now that was really the situation at bar. As we have said, commercially the "advertised" brands had come in the minds of the public to mean a different grade of milk. The public may have been wrong; all milk is subject to the same tests; it may have been right; certainly it was, if the plaintiff's protestations in its advertisements are true. But right or wrong, that is what it believed, and its belief was the important thing. Quite aside from any other consideration the classification was reasonable, given a policy of price fixing at all.

The plaintiff protests that this is to deprive it of a commercial advantage which it is entitled to exploit to the full; the result of the long established reputation of its milk. If that reputation tells the truth, its milk is really of a different grade, and the classification was right; if it does not tell the truth and the plaintiff has been persistently misleading the public all along, certainly the legislature might neutralize a spurious advantage in order to protect those who have not achieved a similarly undeserved reputation. And quite independently of that, if the legislature really did suppose, as it had been told, that, put on even terms, the "independents" would be put out of the market, it was a tolerable policy not to foster the concentration of a whole market into a few hands, or even into large units. State Board of Tax Commissioners v. Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464; Liggett Co. v. Lee, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699; Fox v. Standard Oil Co., 294 U. S. 87, 55 S. Ct. 333, 79 L. Ed. 780. Cheapness and efficiency of production are not the only values which a legislature may take into account; cheapness and efficiency may perhaps not be confined to large units. The plaintiff replies that, had it been the purpose to fix the differential to correspond with different grades, or to protect the consumer against a concentration of control, the advantage would not have been confined to those "independents" who were in business in April, 1933. Even so, as we said in our first opinion, the inequality, if unfair, did not touch the plaintiff, which has no ground for complaint. But that aside, and for argument acknowledging the justice of this criticism, the statute is not part of the permanent legislation of the state; it is a temporary measure to tide over a crisis. Should it stay on the books long enough, it may lose that character, but the three years, 1933, 1934 and 1935 have not been enough. The state asserts that it looks to the eventual termination of the whole system of price fixing and to a resumption of free competition, and we must take it at its word for a season at least. If so, there was good reason to maintain the general pattern of the market as it was. Price fixing inevitably dislocates economic relations to some extent; that is its purpose. But it is certainly desirable that it should upset them as little as is consistent with its main purpose. That purpose here was to improve the farmers' price at as little increase as possible to the consumer. If the "independents" were eliminated, that was an economic hardship to them; it was permissible as an incident of the plan to prefer their survival to the absorption of the whole market by the "advertised" dealers. Moreover, if they were eliminated, the independent farmers, for whom they constituted the demand, must look elsewhere. The "advertised" dealers who would presumably take up that part of the market from which they had extruded the "independents," might create a substitute demand, or they might not. Conceivably they might supply the "independents'" old customers out of their surplus, which at the present time is larger than the necessary minimum. The effect of such changes must always rest in supposition; we cannot reason that if one independent farmer

loses his customer he will surely get another, or even that the farmer who is to supply the demand of the "advertised" dealer who supplants the "independent," will be benefited by the change. Economic processes are not so automatic; there is a friction and a lag in them which cause most of our difficulties. The legislature might properly enough wish to make its temporary expedient as painless as possible, maintaining the general pattern of the industry while the exigency existed, restoring it to its former position when normal times returned. We can see nothing unreasonable, arbitrary or unfair in such a purpose.

The plaintiff finally insists that it has been gravely injured in the process; that the differential is out of proportion to its market advantage, assuming that it has any advantage. The evidence of this is not clear. The twenty-third finding says that the "advertised" dealers have lost sales to stores in bottles in larger measure than the "independents"; but the twentieth and twenty-second findings seem to show that between October, 1933, and November, 1934, the proportion rose slightly. It is true that the twentieth finding speaks generally of the "wholesale" market which ordinarily includes sales to hotels and restaurants, as well as to stores. Of course, it is possible that in 1933 the "loose" milk sold to hotels and restaurants was a smaller proportion of the "wholesale" market than in 1934; but we scarcely ought to assume so. However that may be, the consumption of milk generally has fallen in the past six years; for the "Metropolitan market" it was in 1934 only five-sixths of what it was in 1929. The plaintiff's total business has not suffered so severely as that. Its "retail" or house to house sales during the same period fell off from 24,000,000 to about 18,000,000 quarts per month; its "wholesale" from 11,000,000 to about 9,-000,000. The proportion is about the same, even if we do not count "relief" milk. Probably "wholesale" here includes more than "store" milk; but it does not in the fifty-seventh finding. This shows the sales to stores of "loose" and bottled milk in representative weeks for four of the six years in question. The totals remained fairly constant until "loose" milk was banned in June, 1933. On the whole it has been dropping since that time, so that for the week of November 8, 1934, it was about 82% of that of June 8, 1933. The "loose" milk sold for the week of August 9, 1934, was about 83% of the week of June 8,

1933, and that for the week of November 8th, about 95%. It is hard to say how much it had fallen. The corresponding figures for bottled milk are about 82% and 79%. From finding fifty-eight, taking November for the years 1933 and 1934, it appears that the bottled milk fell off substantially, if we leave out "relief" milk, but not if we include it. How much the relief milk is a drain on bottled milk sold to stores is uncertain; it may well be for it goes to the same class of consumers, people of little means. In November, 1933, the plaintiff sold 83% of its 1929 sales of "loose" and bottled milk, in November, 1934, 71%; it has lost 12%; but this includes bulk milk to stores which fell off daily from 47,000 quarts to 41,000, just about in the same proportion as the total; and it does not include "relief" milk, whatever may be its effect. From all this it seems to us very doubtful whether the differential has really damaged the plaintiff at all.

If it has been damaged, it is because the price difference is greater than its comparative commercial advantage over the "independents." It was obviously difficult in 1934 to find out what that advantage was; only experiment could tell and the field of experiment was somewhat limited. It may have been possible to fix the differential at a fraction of a cent; the market prices had at times differed by fractions before April, 1933. Conceivably it was also possible to sell to customers at fractions of a cent. though nobody has suggested it. In view of the character of the market it is not likely; and we may properly assume, we think, that if there was to be any differential to customers at all, it must be at least a cent. In the absence of some disturbing factor the plaintiff's sales are determined by customers' demand; that is, by the customers' price. The only advantage to it if the differential to the stores were a fraction of a cent would lie in the fact that the retailer who would then by hypothesis have a wider spread, would do his best to push the plaintiff's milk. So far it might profit by a narrow margin; but how far that would help it to hold its place, assuming that it would otherwise lose ground, it was quite impossible to forecast. It does not seem to us that the legislature was compelled to attempt such nice adjustments. It might well reason that a flat price would ruin the "independents," and that a cent differential which the market had carried before would not seriously affect the "advertised" brands. Somebody must stand in

hazard and the "independents" had the greater stake. If indeed a flat price would have ruined them, the policy of price fixing would be confiscation; and being a violent intervention into the status quo, their case against the statute would have been better than the plaintiff's is now. The situation is not wholly unlike that in Miller v. Schoene, 276 U. S. 272, 48 S. Ct. 246, 72 L. Ed. 568; given a policy of price fixing, failure to establish a differential would have been affirmative action. It is impossible to avoid damage to someone when the state steps upon the economic scene; vested interests are disturbed because they are meant to be disturbed. We do not see that the plaintiff has pointed out any clearly better course, and we are persuaded that a flat price was not constitutionally necessary.

The master used as the basis for his conclusions two passages from the opinion of the Supreme Court, on the theory, we assume, that they indicated a decided mind about the validity of the section. In following our own unaided judgment we should be much at fault if this is the proper interpretation to put upon that language; so far as we can see it was not so intended. It is true that on pages 205 and 206 of 293 U. S., 55 S. Ct. 187, 79 L. Ed. 281, the opinion declared that the section gives no evidence of a purpose to prevent monopoly, and that is indubitable, and would have been authoritative for us, if it were not. But we do not understand by this that the court meant to commit itself even on that question, in case it turned out that a flat price for all would or might throw all the bottled store market into the hands of four or perhaps two dealers. Indeed, we can read pages 208 and 209 of 293 U. S., pages 191 and 192 of 55 S. Ct., 79 L. Ed. ——, only as implying that there were relevant issues of fact, or at least issues which might be relevant, and that the result as a whole must be deemed to be in suspense until they were settled. For this reason it has seemed to us that our responsibility remained what it had been before; that we could not with any assurance use the opinion as a guide on the merits of the cause. We should be concerned were there ground to suppose that we were lacking in deference even to the implications of the opinion.

The cause has now been fully heard and is ready for disposition; it should be finally disposed of. A decree will pass dismissing the bill upon the merits with costs.