**BORDEN'S FARM PRODUCTS CO., Inc., v. BALDWIN, Com'r of Agriculture and Markets, et al.**

District Court, S. D. New York.
June 6, 1934.

Timothy N. Pfeiffer, of New York City, for plaintiff.

Henry S. Manley, of Albany, N. Y., for defendants.

Gabriel Kotcher and Ezra B. Kotcher, both of New York City, Leonard Acker, of Brooklyn, N. Y., and Abraham Lipton, of New York City, as amici curiæ, representing various independent milk dealers.

Before L. HAND, Circuit Judge, and GODDARD and COXE, District Judges.

L. HAND, Circuit Judge.

This case comes up upon a bill in equity to enjoin the Commissioner of Agriculture and Markets of New York, the Director of the Division of Milk Control, the Attorney General, and the various district attorneys of the city of New York, from enforcing section 258-q of the Agriculture and Markets Law (Consol. Laws, c. 69), enacted on April 1, 1934; which, so far as is pertinent, is printed in the margin.* Section 258-m of the act authorized the commissioner upon making proper investigation to fix minimum prices to be paid by milk dealers to producers for milk of various grades, and to be charged by milk dealers to consumers and stores, and by stores to consumers. An earlier act which was to expire on March 31, 1934, contained similar provisions (section 312 (b) and section 317 (c) of chapter 158 of the Laws of 1933), under which the Board of Milk Control, the predecessor of the present commissioner, had determined that the phrase, "well advertised trade name" should include only the plaintiff and three other of the larger dealers in milk. This order has remained in force and the plaintiff has not tried to secure any enlargement of the class. The four distributers named sell about 35 per cent. of the bottled milk that is sold to stores in New York City; the remainder is sold by a large number of "independent" dealers. It does not appear how large a part of the bottled supply which is delivered directly to the consumer is in the hands of the four; the report of the Joint Committee appointed by the New York legislature (page 166), declared that in 1933, 95 per cent. of the retail

---

* " It shall not be unlawful for any milk dealer who since April 10, 1933, has been engaged continuously in the business of purchasing and handling milk not having a well advertised trade name in a city of more than one million inhabitants to sell fluid milk in bottles to stores in such city at a price not more than one cent per quart below the price of such milk sold to stores under a well advertised trade name, and such lower price shall also apply on sales from stores to consumers; provided that in no event shall the price of such milk not having a well advertised trade name, be more than one cent per quart below the minimum price fixed for such sales to stores in such a city."

distribution was in the hands of five companies. By far the greater quantity of milk sold in New York is known as Grade B, the price of which the commissioner fixed at 12 cents for dealers direct to the consumer; 10 cents from the dealer to stores; and 11 cents from the store to the consumer. The result of the privilege given by section 258-q is that unadvertised dealers may sell to stores at 9 cents, and that the stores may pass on this differential to the consumer. The law provides for the granting of licenses by the commissioner without which no one can sell milk (section 257); to get a license the dealer must state such facts as the commissioner considers necessary (section 258), among which he has directed that the applicant shall agree in writing to obey all the provisions of the law. As a consequence the plaintiff must surrender its power to challenge the validity of section 258-q, or proceed by such a bill as this. Every sale of milk is subject to a fine if the seller is not licensed; and as the plaintiff makes many sales every day, the cumulative penalties are destructive. Nobody suggests that the situation so presented is not proper for the intervention of a statutory court under section 266 of the Judicial Code (28 USCA § 380), and our jurisdiction to decide the constitutionality of the statute is therefore apparent and unchallenged. We proceed to the merits.

We may not concern ourselves with the wisdom of the effort in which the Legislature of New York has engaged, or of the appropriateness of the means it has taken. To fix minimum prices for milk may in the end result in lessening consumption and leave the farmer, who is the putative beneficiary, in a worse position than he was before; conceivably there is no escape except by curtailing production, whatever the attendant distress. With all this we have nothing to do; it has now been finally decided that the program is lawful, and our consideration is narrowed to this incident in the general scheme. Nebbia v. N. Y., 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469. The immediate problem is not old; before June 1, 1933, "loose" (unbottled) milk could be lawfully sold in the city of New York, and it was impractical to sell it at two prices because the ordinary consumer did not distinguish whose milk he was getting; substantially no bottled milk was sold by stores, and there was active competition in "loose" milk, which was sold both by the "well-advertised" dealers and the "independents." When, however, by ordinance the city forbade its sale, the older brands could at once be detected, and the "independents," whose hold upon this part of the market then became precarious, demanded some protection against what they asserted to be an unfair advantage. The Act of 1933 did not when introduced contain any such provision; it was amended in committee, indeed in advance of the actual prohibition of "loose milk," though the ordinance had been passed some months before. The joint legislative committee had not recommended it. Nor did the provision appear in the original act of 1934; again it was introduced at the demand of the "independents" and to meet their supposed grievance. We do not see, however, that this is relevant. Most legislation is the resultant of conflicts between economic or social interests, and the Legislature is the only place where they can be settled. The situation here was such that the Legislature might fear that the larger dealers would gather into their hands substantially all sales of milk to stores; just as they already had gathered direct sales to consumers. If the "independents" had to sell at the same minimum, the public would probably choose the well-known brands; at any rate, that was a reasonable possibility, to be provided against if the result was undesirable. Perhaps it was not; it may be better to allow the four larger companies to take full advantage of their advertising, of their reputation for cleanliness and quality; certainly it is true that the statute seeks to take from them economic advantages which were not only theretofore lawful, but which have generally been commended and fostered. But the consequences of allowing these advantages their full effect would probably, or at least it might, eliminate the "independents" from that part of the market which fed stores. If it did, the whole market would fall into few hands. That might be a good thing, or it might be a bad; but concentration of economic power has generally been watched with a jealous eye in this country. To prevent it or to break it up, rather than to regulate it after it arises, has on the whole been our preferred way; and in this instance competition between the four "well-advertised" dealers, might be thought not enough security. Many are fearful of hidden arrangements which may be made when the field is narrowed to a few. Often such suspicions are unreasonable, but they are part of that stock of beliefs on which a legislature is justified in acting; it is not like a court, limited to premises which it can prove. Nor was it necessary that the law should cover more than the city, itself more populous than any state of the Union except New York.

Finally, if it was irrational to confine the differential to those "independents" who were in business on April 10, 1933, at least the plaintiff cannot complain of that; its favored competitors are thereby the fewer. Besides, it may have been thought that there were enough in the field already.

Further, it seems to us that the action may have been thought to fit in with the major purposes of the statute, which was to relieve the dairy farmer by insuring him a better price without reducing his market. His price was fixed for all "independents" and "well-advertised" dealers alike; but the amount of milk sold might vary with the price to the consumer, at least that is true for most commodities. The attempt was not to fix two prices in the same market for the same commodity; the hypothesis is that to the public a well-known brand is of different quality. If this proves true, the several brands will sell together; the cheaper will not drive out the dearer. The result will be, or it may be —for we must deal only in possibilities—that more milk will be marketed than if the fixed price were uniformly maintained, though less than if it were lowered. True, the "spread" between the farmer's and the consumer's price was fixed where it was, we assume, to protect the farmer, and any concession like this may somewhat endanger it. That it would break it down no one can say in advance; certainly it may have a very different effect from a lesser "spread" generally available over the whole market. Such questions of more or less, of how far principle may be sacrificed without sacrificing substance, are typical of those which Legislatures must answer; as soon as we can see a possible purpose in the measure, our function ends. It is scarcely possible to conceive of a policy of price fixing which will not disturb existing economic powers; its very postulate and purpose is to do so, to favor this group, which is weaker, to repress that, which is stronger. The state takes a hand because it is not satisfied with the final equipoise, which surrenders other values conceived to be greater. It must appraise those values for itself. Miller v. Schoene, 276 U. S. 272, 279, 48 S. Ct. 246, 72 L. Ed. 568; Radice v. New York, 264 U. S. 292, 294, 295, 44 S. Ct. 325, 68 L. Ed. 690. We have indeed an eventual review of that appraisal, but only, as we understand it, when we can see beyond a doubt that its implicit standards are not among those current and generally acceptable in the community. We are not satisfied of that in this instance.

No precedents come very close, but the "trading-stamp" cases (Rast v. Van Deman & Lewis Co., 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Tanner v. Little, 240 U. S. 369, 36 S. Ct. 379, 60 L. Ed. 691,) and the "chain-store" tax cases (State Board of Tax Com'rs v. Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464; Liggett Co. v. Lee, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699), appear to us pertinent. True, courts have been more chary in upsetting tax statutes than general municipal regulations, but there are sound analogies notwithstanding. The burden of an unequal tax is as effective a handicap in marketing the taxpayer's product as a duty to charge a fixed price. The taxpayer can hold his market only in case his profits are already so large that he can bear the added load without increasing his price. Otherwise he must raise it, and then he falls into the same position as the plaintiff here. In the decisions we have cited the only discernible ground for the legislation was to ease competition in favor of weaker members of a mutually competing group; here it is not so much the "independent" dealers whom the Legislature may have had in mind, as the farmer whose market might be better secured. As between the two situations the advantage seems to us to lie with the present statute. The plaintiff sets its chief reliance upon Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92, and Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264. Some of the language of the minority opinion in the first case might indeed give it comfort, but the case concerned a statute which singled out one company alone, and that was the only ground for the decision of six of the justices who concurred. It has been so interpreted. Consol. Coal Co. of St. Louis v. Illinois, 185 U. S. 203, 207, 208, 22 S. Ct. 616, 46 L. Ed. 872; Arkadelphia Milling Co. v. St. Louis, etc., Ry., 249 U. S. 134, 149, 39 S. Ct. 237, 63 L. Ed. 517. As for Smith v. Cahoon, the statute was held bad because no one was able to suggest any rational ground for the discrimination; in a similar situation where such a ground could be found, the court reached the opposite result. Continental Baking Co. v. Woodring, 286 U. S. 352, 52 S. Ct. 595, 76 L. Ed. 1155, 81 A. L. R. 1402.

The bill does not state a cause of suit and must be dismissed; the application for an injunction pendente lite necessarily falls along with it. We do not understand that rule 70½ of the Equity Rules (28 USCA § 723) applies to this situation and therefore

make no findings. The motions to intervene are denied.

Bill dismissed; injunction denied; intervention denied.