BORDEN'S FARM PRODUCTS CO., INC. *v.* BALD-
WIN, COMMISSIONER OF AGRICULTURE AND
MARKETS OF NEW YORK, ET AL.

No. 296.   Argued November 6, 7, 1934.—Decided December 3, 1934.

*Mr. Walter E. Hope,* with whom *Mr. Timothy N. Pfeiffer* was on the brief, for appellant.

197

*Mr. Henry S. Manley,* with whom *Mr. John J. Bennett, Jr.,* Attorney General of New York, and *Mr. Henry Epstein,* Solicitor General, were on the brief, for appellees.

198

By leave of Court, *Messrs. Gabriel Kotcher* and *Ezra B. Kotcher* filed a brief on behalf of the Independent Milk Dealers of Brooklyn and New York and the Independent Producers of the State of New York, as *amici curiae*.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The New York Milk Control Law of April 10, 1933,[1] in authorizing the Milk Control Board to fix minimum prices for sales of fluid milk in bottles by milk dealers to stores in a city of more than one million inhabitants, established a differential of one cent a quart in favor of dealers not having a " well advertised trade name." [2] The Milk Control Board determined that the phrase " well advertised trade name " referred to four dealers, of which the complainant, Borden's Farm Products Company, Inc., is one.[3] The authority of the Board terminated on March 31, 1934. An amended act was passed to take effect April 1, 1934,[4] which placed the milk control in a division of the Department of Agriculture and Markets. This Act continues the differential of one cent a quart in sales of fluid milk in bottles by dealers to stores, in favor of dealers not hav-

---

[1] Laws of 1933 (N. Y.), chap. 158; see *Nebbia* v. *New York*, 291 U. S. 502.

[2] *Id.*, § 317 (c) .

[3] Order of May 5, 1933. The four dealers thus designated were: " Borden's Farm Products Co., Inc., ' Borden '; Sheffield Farms Co., Inc., ' Sealect '; Dairymen's League Co., ' Dairylea '; and M. H. Renken Dairy Co., ' Renken.' "

[4] Laws of 1934 (N. Y.), chap. 126.

ing a well advertised trade name, and provides that the lower price shall also apply on sales from stores to consumers.[5]

Complaining that the fixing of this differential, in respect to sales of the same commodity, was an invasion of rights guaranteed by the Fourteenth Amendment, plaintiff brought this suit to enjoin enforcement. An interlocutory injunction was sought and a court of three judges was convened. Defendants moved to dismiss the complaint upon the grounds that it failed to state a cause of action in equity and that the provision of the statute was constitutional. Affidavits were presented on both sides and the case was heard on the motion for injunction and the motion to dismiss. In view of the cumulative penalties provided, the court had no doubt of its jurisdiction to pass upon the question of constitutionality. Dealing with the case in that aspect, the court held that the complaint did not state a cause of suit and dismissed it for that reason. The court regarded the application for an interlocutory injunction as necessarily falling with the complaint and hence made no findings of fact. 7 F. Supp. 352, 354. The plaintiff appeals.

We turn to the allegations of the complaint. Plaintiff sets forth the full text of the acts of 1933 and 1934 and of the applicable orders. By the order of the Commissioner

---

[5] *Id.*, § 258–q. The provision is as follows: " It shall not be unlawful for any milk dealer who since April tenth, nineteen hundred thirty-three has been engaged continuously in the business of purchasing and handling milk not having a well advertised trade name in a city of more than one million inhabitants to sell fluid milk in bottles to stores in such city at a price not more than one cent per quart below the price of such milk sold to stores under a well advertised trade name, and such lower price shall also apply on sales from stores to consumers; provided that in no event shall the price of such milk not having a well advertised trade name, be more than one cent per quart below the minimum price fixed for such sales to stores in such a city."

of Agriculture and Markets the minimum prices for the sale of fluid milk in bottles by dealers to consumers and to stores, and by stores to consumers, are fixed for the city of New York. The order determining the four dealers who have a " well advertised trade name " is continued in effect. Plaintiff alleges that for many years it has been continuously engaged in purchasing and selling milk in bottles in the city of New York and has built up a large business under its trade name " Borden's " for sales both to consumers and to the stores described in the statute; [6] that it operates nine retail stores in the city at which it has an extensive business in the sale of bottled milk to consumers under its trade name; that it has obtained from the Board of Health of the city all the necessary licenses and permits and has observed all the regulations of the Sanitary Code; that it has expended large sums in advertising its trade name and has thus created a valuable good will. Plaintiff alleges that it is in direct and active competition with numerous individuals, corporations and associations which are selling bottled milk to stores in the city but are not within the official determination of those having a " well advertised trade name "; that these competitors are permitted to sell to stores bottled milk at a price one cent per quart below the minimum price at which plaintiff is permitted to sell its bottled milk to stores under its trade name; and that stores are permitted to sell to consumers the bottled milk of these competitors with the same differential as compared with the minimum price at which plaintiff's milk may be sold by stores, and thus plaintiff is deprived of a large part of the market for its milk and the value of its property and good will are seriously impaired. Plaintiff

---

[6] The act of 1934, like the preceding act, defines " store " as meaning " a grocery store, hotel, restaurant, soda fountain, dairy products store and similar mercantile establishment." § 253.

states that the loss in trade it thus suffers amounts to not less than 25,000 quarts of bottled milk daily.

Plaintiff alleges that the maintenance of this differential, with the consequent privilege to its competitors and restraint upon itself, is "arbitrary, oppressive and discriminatory" and has "no relation to the protection of the public health or the public welfare or to any of the objects or purposes" for which the statute was enacted, and upon this ground plaintiff charges that the statutory provision violates the due process and equal protection clauses of the Fourteenth Amendment. Inability to obtain a license, unless plaintiff agrees in writing to comply with the statute and orders, and the prohibitive character of the penalties prescribed, are assigned as affording the basis of equitable jurisdiction.

We have frequently said, especially in confiscation cases, that a mere general allegation of repugnance to the Fourteenth Amendment is not enough to state a cause of action to restrain the enforcement of a statute or administrative order. See *Aetna Insurance Co.* v. *Hyde,* 275 U. S. 440, 447; *Public Service Comm'n* v. *Great Northern Utilities Co.,* 289 U. S. 130, 136, 137; *Hegeman Farms Corp.* v. *Baldwin, ante,* p. 163. But in determining the sufficiency of the allegations of the complaint we cannot fail to take note of the nature and effect of the legislative action which is assailed. Both nature and effect are apparent. We have here a novel, if not a unique, provision. The legislature does not purport to exercise an authority merely to fix prices, or minimum prices, or to make different prices for different grades of milk, but attempts to establish for the respective dealers different minimum prices for the same grade of milk, bought and sold at the same time and place and under precisely the same conditions aside from the use of a well advertised trade name. There is no uncertainty as to the effect of

the discrimination. As the court below said, the statute seeks to take away from dealers who have well advertised trade names, " economic advantages which were not only theretofore lawful, but which have generally been commended and fostered." It strikes at the advantage acquired by dealers through the reputation of their brands and the consequent disposition of the public to buy them. In view of the peculiar nature and effect of this provision, and of the novel and important constitutional question that it presents, we think that the complaint should not have been dismissed for insufficiency upon its face and that the plaintiff is entitled to have the case heard and decided with appropriate findings by the trial court, unless it satisfactorily appears, upon facts of common knowledge or otherwise plainly subject to judicial notice, that the provision should be sustained as resting upon a rational basis consistent with constitutional right. Accordingly, we pass to the consideration of the various grounds that are suggested as adequate support for the legislative action.

In this inquiry, we again observe the limited operation of the provision. It is restricted to the city of New York, and to sales of bottled milk to and by stores. It does not apply to retail delivery direct to consumers and not through stores. It relates solely to minimum prices. It is not addressed to any practice in the industry, or trade in relation to production, handling or selling, apart from the trade name employed. As to all such matters, a dealer with a well advertised trade name is subject to the same strict requirements as are all other dealers. The price to the producer, the farmer, is not affected by the differential. He receives the same price for his milk whether it is sold by dealers with well advertised trade names or otherwise. We have had occasion to note that " Save the conduct of railroads, no business has been so

thoroughly regimented and regulated by the State of New York as the milk industry." For many years, it has been " progressively subjected to a larger measure of control." *Nebbia* v. *New York, supra,* pp. 521, 522. This control has been in the interest of sanitary precautions and proper methods of production and trade. But because of the serious condition of the industry by reason of decline in prices and demoralizing practices, as reported by a legislative committee after an elaborate examination, and upon the committee's recommendations, the legislature has now proceeded to price control. The legislative committee did not, however, recommend the fixing of the differential here in question, and hence did not state grounds in support of such a discrimination.[7] But in considering possible grounds, we are aided by the suggestions which the Attorney General of the State and the counsel for the Department of Agriculture and Markets, with their special experience, have been able to bring forward.

The ground chiefly urged is that the provision is intended as a precaution against monopoly. We turn to the expressed criterion of the statute. That criterion does not refer to restraint of trade in any of its connotations, or to any coercive action or unfair practice, or to any combination or concert. The provision for the differential is silent as to the use of any monopolizing methods or as to any monopolistic achievement. While dealers having well advertised trade names are grouped for the purpose of the differential, the statute is directed not at concerted action, but at the individual members of the group which are not shown to be, or, for the application

---

[7] It appears that in the case of both the acts of 1933 and 1934, the provision in question was added in the course of legislative consideration of proposed measures and at the instance of dealers described as independents. 7 F. Supp., p. 353.

of the differential, need not be, in any sort of combination or acting otherwise than in lawful competition with each other as well as with other dealers. The differential hits each dealer having a well advertised trade name regardless of the extent of that dealer's trade. That may be large or small. The court below said in its opinion that the four distributors determined by the department to have well advertised trade names sell about 35 per cent. of the bottled milk that is sold to stores in the city of New York and this is also stated in appellant's brief. That appears to be the amount of the described trade of the entire group, which are united only by the common characteristic that each member has a well advertised trade name. How much of the trade each of the four distributors may have, does not appear.[8] So far as the criterion of the statute is concerned, that makes no difference. If the statutory provision is sustained as to Borden's, on the simple showing of a well advertised trade name, without more, it must also be sustained as to every other dealer with a well advertised trade name—those now on the list and those which the state authority may hereafter place there—no matter how small a part of the trade the dealer may have, or how independent of any connection with anyone else, or how free from any improper trade practice or lacking in monopolistic opportunity, such a dealer may be.

The suggestion has been made that the provision for the differential may find support in a supposed policy to increase the sales of milk,—that more milk may be sold than if the price were uniformly maintained. This suggestion does not appear to be sponsored by the Attorney

---

[8] Thus it does not appear how much of the " store " trade in bottled milk is that of the Borden Company or of the Sheffield Company or of the Dairymen's League Company or of the Renken Dairy Company, the four distributors found to have well advertised trade names.

General and the counsel for the Department of Agriculture and Markets. The answer is made that whatever opportunity there may be for increased sales lies in the lower price and not in the differential. If it be assumed that the lower price is a reasonable minimum and that it favors sales, the maintenance of the differential prevents the plaintiff and others in like case from resort to it.

Putting aside fanciful considerations, the argument at the bar has presented the case in its essential features. It is shown that the legislature was inspired by the fear that in a competitive market, under strict regulation and with a scheme of minimum prices, dealers without well advertised brands, the so-called independent dealers, would be at a disadvantage. The aim was not at advertising but at its natural result. " Well advertised " means well known. In setting up the differential, the legislature did not deal with monopoly in the ordinary sense of the term, but with an aggregate of economic advantages, lawfully and severally acquired, and possessed in varying degrees by the separate concerns having well known brands. The legislature put all these in one class and placed it under a handicap. For this discrimination, a special justification is urged. Respondent's counsel contend that the fixing of the differential was an effort to continue a condition which had obtained before the Milk Control law was enacted; that, previously, milk of the independent dealers had sold at lower prices than the milk of the well known brands; that in establishing price control, the legislature sought to preserve opportunities in competition which in actual practice the independent dealers had thus enjoyed and to prevent their trade from being destroyed by the operation of a scheme of uniform prices. The argument is that the legislature was confronted with a " practical situation "; that " the independents were to be deprived

of their buying advantage by compelling all dealers to buy from producers at prices fixed according to utilization of the milk "; that this regulation involved " a stern readjustment of former competitive conditions," and the question was whether the independents should also be deprived of their selling advantage. The point is also made that the Milk Control law purports to be an emergency measure and that the legislature was entitled to protect existing opportunities of the independent dealers so that, if the emergency ceased and price control were abandoned, there could be a return to competitive conditions without such an elimination of dealers as might be caused by a temporary period of compulsory minimum prices on a uniform scale.

The factual basis of this contention is disputed and there are no findings disclosing it. Appellant asserts that there was not at any time any customary or accepted difference in price between the milk sold by it under its trade name and the milk of its competitors who are now favored by the fixed differential. And reference is made to the disturbed state of the trade, preceding the enactment of the Milk Control law, and to the effect of the ban imposed by local ordinance upon the sale of " loose milk," which led to changes in methods of distribution and to price adjustments from time to time in order to meet competition.

For the present purpose, it is sufficient to say that these arguments are addressed to particular trade conditions in the city of New York, which largely lie outside the range of judicial notice. Counsel refer to the affidavits submitted on the motion for injunction. And we are asked to extract from various tables and statements in the reports of the legislative committee, which were not addressed to the fixing of the differential here in question, sufficient data upon which to predicate a judgment. But

the case is not before us upon evidence, or upon determinations of fact based on evidence, as the complaint was dismissed solely in the view that it failed to state a cause of action and the motion for injunction accordingly fell without findings being made. As we have said, we may read the complaint in the light of facts of which we may take judicial notice, but if, so read, it may be regarded as sufficient, the decision of this appeal should not turn on other facts which are the proper subjects of evidence and of determinations of fact by the trial court.[9]

Respondents invoke the presumption which attaches to the legislative action. But that is a presumption of fact, of the existence of factual conditions supporting the legislation. As such, it is a rebuttable presumption. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–80; *Hammond* v. *Schappi Bus Line,* 275 U. S. 164, 170–172; *O'Gorman & Young* v. *Hartford Insurance Co.,* 282 U. S. 251, 256–258. It is not a conclusive presumption, or a rule of law which makes legislative action invulnerable to constitutional assault. Nor is such an immunity achieved by treating any fanciful conjecture as enough to repel attack. When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary. *Lindsley* v. *Natural Carbonic Gas Co., supra; Clarke* v. *Deckebach,* 274 U. S. 392, 397; *Lawrence* v. *State Tax Comm'n,* 286 U. S. 276, 283. The

[9] How hazardous it is to assume that particular trade facts are of common knowledge is shown by the various estimates of the number of " stores " at which milk is sold in the city of New York, these estimates apparently varying from 25,000 to 60,000.

principle that the State has a broad discretion in classification, in the exercise of its power of regulation, is constantly recognized by this Court. Still, the statute may show on its face that the classification is arbitrary (*Smith v. Cahoon,* 283 U. S. 553, 567) or that may appear by facts admitted or proved. *Southern Ry. Co.* v. *Greene,* 216 U. S. 400, 417; *Air-Way Electric Corp.* v. *Day,* 266 U. S. 71, 85; *Concordia Insurance Co.* v. *Illinois,* 292 U. S. 535, 549. Or, after a full showing of facts, or opportunity to show them, it may be found that the burden of establishing that the classification is without rational basis has not been sustained. *Lindsley* v. *Natural Carbonic Gas Co., supra; Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Radice* v. *New York,* 264 U. S. 292; *Clarke* v. *Deckebach, supra; Ohio Oil Co.* v. *Conway,* 281 U. S. 146; *Tax Commissioners* v. *Jackson,* 283 U. S. 527. But where the legislative action is suitably challenged, and a rational basis for it is predicated upon the particular economic facts of a given trade or industry, which are outside the sphere of judicial notice, these facts are properly the subject of evidence and of findings. With the notable expansion of the scope of governmental regulation, and the consequent assertion of violation of constitutional rights, it is increasingly important that when it becomes necessary for the Court to deal with the facts relating to particular commercial or industrial conditions, they should be presented concretely with appropriate determinations upon evidence, so that conclusions shall not be reached without adequate factual support.

Respondents' counsel, referring to the difficulties of price regulation, say that "Apparently the fixing of prices by government discovered as many troubles as were loosed from Pandora's box." This complexity of problems, however, makes it the more imperative that the Court in discharging its duty, in sustaining governmental

authority within its sphere and in enforcing individual rights, shall not proceed upon false assumptions.

As the court below said, no precedents come very close to the instant case. In *Rast* v. *Van Deman & Lewis Co., supra,* the facts were fully disclosed (pp. 345–347), and it was held that the use of profit-sharing coupons and trading stamps constituted a distinct method of doing business justifying license taxes (p. 357). The Court pointed out that the complainants' schemes did not rest with mere advertising, with " identification and description, apprising of quality and place," where the " acquisition of the article to be sold constitutes the only inducement to its purchase " according to the " practice of old and familiar transactions," but that those schemes tempted by a promise of a value greater than the article sold and hence might be thought to be a " lure to improvidence " (p. 365). See, also, *Tanner* v. *Little,* 240 U. S. 369. In *Tax Commissioners* v. *Jackson, supra,* where a license tax with respect to chain store operation was upheld, evidence had been received and considered by the District Court, but that court did not go beyond a partial summary of the facts and general conclusions of law. We said that had Equity Rule 70½ been in force at the time of the trial, we should feel constrained to remand the case with directions to make findings of fact (p. 533); but in the circumstances the Court proceeded to summarize the proofs, and, on a full examination of the factual differences between chain stores and individually owned units, reached the conclusion that these differences afforded a basis for the tax assailed (pp. 534–536, 541). See, also, *Liggett Co.* v. *Lee,* 288 U. S. 517, 532.

The importance of adequate findings of fact in relation to controlling economic conditions was emphasized in *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543. The suit had

been brought to restrain the enforcement of an order of the Rent Commission of the District of Columbia cutting down rents for apartments. Plaintiff alleged that the emergency which had been held to justify the rent measures (sustained in *Block* v. *Hirsh,* 256 U. S. 135), had ceased. We said that the plaintiff's allegations could not "be declared offhand to be unmaintainable" and that it was not impossible "that a full development of the facts" would show them to be true, and in that case the operation of the statute would be at an end (p. 548). Before deciding the question, we found that it was "material to know the condition of Washington at different dates in the past" and that "obviously the facts should be accurately ascertained and carefully weighed." We said that this could be done more conveniently in the Supreme Court of the District than here, and, for this reason, the judgment below, dismissing the bill, was reversed and the cause was remanded for appropriate ascertainment of the facts (p. 549).

Another illustration is found in *Hammond* v. *Schappi Bus Line, supra,* involving the validity of a city ordinance regulating motor traffic in designated parts of the city's streets. The lower courts had not made findings upon crucial questions of fact. There were affidavits below, which, we said, " are silent as to some facts of legal significance; lack definiteness as to some matters; and present serious conflicts on issues of facts that may be decisive." We held that before the questions of constitutional law, both novel and of far-reaching importance, were passed upon by this Court, " the facts essential to their decision should be definitely found by the lower courts upon adequate evidence." (pp. 171, 172.) Concluding that the case had not been appropriately prepared for final disposition, we remanded it for proceedings in the District Court, " with liberty, among other things, to allow amendment of the pleadings." This procedure was in accordance

with well-established precedents. See *Estho* v. *Lear,* 7 Pet. 130; *Chicago, M. & St. P. Ry. Co.* v. *Tompkins,* 176 U. S. 167, 179; *United States* v. *Rio Grande Irrigation Co.,* 184 U. S. 416, 423; *Lincoln Gas Co.* v. *Lincoln,* 223 U. S. 349, 364.

A similar course should be taken here. While the complaint is lacking in the specific and definite allegations as to trade conditions which would be appropriate to the plaintiff's assertions in supporting its attack on the statute, we think that the plaintiff should not be refused standing in court upon the allegations made. As we do not approve the procedure adopted below, we do not pass upon the ultimate question of the constitutionality of the statute. The plaintiff should be permitted to proceed with the cause; the motion for preliminary injunction should be heard and decided, and the cause should proceed to final hearing upon pleadings and proofs; the facts should be found and conclusions of law stated as required by Equity Rule 70½.

The decree is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE STONE and MR. JUSTICE CARDOZO concur in the result in the following memorandum:

We are in accord with the view that it is inexpedient to determine grave constitutional questions upon a demurrer to a complaint, or upon an equivalent motion, if there is a reasonable likelihood that the production of evidence will make the answer to the questions clearer.

Since our brethren find that likelihood to be present in this case, and are content to postpone an adjudication of the merits, we refrain from any discussion of the validity of the statute on the basis of facts within the range of judicial notice, and assent to the judgment recommended in the opinion of the court.