[Civ. No. 13913.   First Dist., Div. Two.   May 19, 1949.]

FRENCH ART CLEANERS (a Corporation), Respondent,
v. STATE BOARD OF DRY CLEANERS, Appellant.

Fred N. Howser, Attorney General, and J. Albert Hutchinson, Deputy Attorney General, for Appellant.

George M. Naus and Nathan Kessler for Respondent.

Geo. E. Cryer and R. Alston Jones, as Amici Curiae on behalf of Respondent.

GOODELL, J.—This is an appeal from an order granting a preliminary injunction. The court enjoined the board from "enforcing [as to plaintiff] or seeking to enforce any of the price orders and price lists of which copies are annexed to the complaint . . . as Appendices A, B and C, and . . . from establishing any minimum price schedules pursuant to the provisions of Sections 9563 through 9566 of the Business and Professions Code . . ." until the further order of the court.

At the 1945 session the Legislature enacted chapter 1517 which codified 61 sections dealing with cleaning and dyeing, including said four, into the Business and Professions Code. Sections 9563, 9564 and 9566 were amended in 1947 (ch. 1163). The four sections in question now read:

Section 9563. "The board may establish minimium price schedules for the various items of cleaning, dyeing and pressing services for any city or county or other area as may be determined by the board upon the filing of a petition with it, requesting a minimum price schedule for that city or county or other area signed by seventy-five per cent (75%) or more

of the persons in that city or county or other area who are licensed under this chapter.''

Section 9564. ''Upon receipt of a petition under this article the board shall investigate and ascertain those minimum prices which will enable cleaners, dyers or pressers in that city or county or other area to furnish modern, proper, healthful and sanitary services, using such appliances and equipment as will minimize the danger to public health and safety incident to such services.

''In establishing minimum price schedules, the board shall consider all conditions affecting the business of cleaning, dyeing and pressing in that city, county or other area and the relation of those conditions to the public health, welfare and safety.''

Section 9565. ''Before the board shall establish minimum price schedules pursuant hereto in any city, county or other area, the board shall cause to be conducted in such city, county, or other area a cost survey .... to determine the cost of the various items of cleaning, dyeing and pressing service for which minimum price schedules shall be established and in establishing such minimum price schedules the board shall not fix a price for any service at a sum less than that which is shown to be the cost price of such service in the cost survey which shall be conducted in the city, county or other area for which such price is established . . .''

Section 9566. ''At the conclusion of an investigation therefor, the board may establish a reasonable and just minimum price schedule conforming to the requirements of this article. If the board, after investigations made either upon its own initiative or upon the complaint of fifty-one per cent (51%) or more of the persons licensed under this chapter in the city or county or other area for which the minimum price schedule is established determine that the minimum price so established or any of them are insufficient properly to provide healthful and proper services to the public and to maintain a clean, healthful, safe and sanitary cleaning, dyeing or pressing establishment, or that any minimum price set creates an undue hardship on any licensee under this act, the board may vary or fix anew a minimum price for any cleaning, dyeing or pressing service in that city, county or other area.''

On January 14, 1948, the board promulgated retail and wholesale minimum price schedules for 17 areas in Alameda County, namely, Oakland, Piedmont, Berkeley, Alameda, 12 other cities, and Castro Valley. Appendix A to the complaint

contains the general order, B sets forth the retail, and C the wholesale minimum prices fixed by the schedules.

Respondent took no part in the board's proceedings leading up to these orders although it had the right to do so.

The application for a preliminary injunction was heard on the verified complaint alone. Its allegations, insofar as they are pertinent to the questions now involved, are summarized as follows:

Under the code the board is composed of seven members, consisting of "one public member and the owners of two retail plants, two wholesale plants, and two shops"; each of the six who are plant and shop owners has "a personal, private, direct, pecuniary and selfish interest, in common to the six, in (1) preventing price competition in the service industry and business of dry cleaning and pressing of garments worn by members of the general public, and in (2) making and maintaining as high as possible the prices paid by the members of the general public for cleaning and pressing garments worn by the latter, without regard to the interest of the general public in any lower price, even though a lower price be a fair and adequate one reached through fair and open competition for the business of cleaning and pressing garments."

Plaintiff for about 15 years by itself and its predecessor had conducted in Oakland a clothes cleaning establishment and since 1945 has been licensed to operate a dry cleaning plant.

Plaintiff is a "wholesale plant owner," i. e., more than 51 per cent of its gross sales are to retailers who deal exclusively with the public, and in addition to its wholesale plant it is the owner of two retail stores, one in Oakland and one in Berkeley, operated under the name "Pay Less Cleaners," where cleaning and pressing is retailed to the public. As to those two stores it is a "retail plant owner."

The cleaning and pressing retailed at the two retail stores is done at plaintiff's wholesale plant, but comprises less than 25 per cent of the total production of the wholesale plant. The remainder of more than 75 per cent of plaintiff's wholesale production is wholesaled to independent retail stores, i. e., "retail plants" and "shops."

Union shop conditions prevail in the cleaning and pressing industry in Alameda County and plaintiff's employees are unionized; plaintiff pays not less than the union scale of wages to its employees and maintains union hours and working conditions in its plants.

In August, 1947, more than 75 per cent of the board's licensees in Alameda County, acting under section 9563, petitioned the board to "establish minimum price schedules for various items of cleaning, dyeing and pressing service in said Alameda County for both wholesale and retail" in which plaintiff did not join or acquiesce.

Thereupon the board conducted a cost survey and investigation, and at its conclusion issued the orders in question.

Notwithstanding the petition requested the board to establish minimum prices for the items of cleaning, dyeing and pressing, the orders fix prices for cleaning alone, without any mention of pressing, excepting only that in the fair trade practice rules appearing in Exhibits B and C it is forbidden that pressing be done as "free work" in connection with any minimum price charged for the cleaning of a garment.

"The prices . . . established by said Board . . . are exorbitant, unreasonable and unfair to the members of the general public."

There are in Alameda County not more than 76 cleaning plants licensed "to perform the service of dry-cleaning by immersion and agitation, or immersion only, in a volatile, commercially moisture-free solvent," within the meaning of sections 9501 and 9507 and that those 76 plants dry-clean the hundreds of thousands of outer garments worn by the persons comprising the population of the county.

(Here follow allegations describing the several processes and procedures of wet-cleaning and dry-cleaning, not necessary to be set forth. The process of plain and fancy "spotting" is likewise described elsewhere in the complaint.)

After these descriptions the complaint alleges that "dry solvent has identical chemical and physical effects in all dry-cleaning plants. Its action on soil in garments in any one plant is uniform with its action on soil in any other plant. It is as safe and healthful in any one plant as in any other. It is . . . a safety solvent, and has completely superseded the use of gasoline two decades ago. Its safety in use is under the sole jurisdiction of the State Fire Marshal . . . Plaintiff's dry-cleaning operations are conducted thereunder in a safe and healthful manner."

Plaintiff does not (as some plants do) supplement power pressing with handiron pressing, nor does it (as some plants do) enclose finished garments in packages or containers for delivery to customers, nor does it (as some plants do) "finish"

cleaned and pressed garments by mending, sewing on buttons, and other small repairs.

The following allegations are quoted verbatim:

"VII. (a) The members of the general public who do not clean and press their own garments but have the service performed by another divide broadly into two classes: (1) Those who, regardless of the higher cost and price, desire the fullest possible extent of cleaning, spotting and pressing; (2) Those who desire to keep their cost of living down by disregarding the ultimate in the esthetics of garment beauty and therefore voluntarily and knowingly desire, seek and choose the lower cost and price attainable in a cleaning and pressing service, such as that given by plaintiff, from which wet-cleaning, fancy spotting, hand pressing, and finishing and packaging frills are excluded.

"(b) The minimum price for a man's suit or woman's dress under Exhibit B is $1.22, which covers the service for the higher cost and price class, aforesaid. Plaintiff's price is 69 cents for the lower cost and price class, aforesaid.

"(c) The cleaning, spotting and pressing service rendered by plaintiff is proper, healthful and sanitary; it is satisfactory to plaintiff's customers; and the plaintiff's lower prices yield it a fair and reasonable profit. Those members of the public in Alameda County who are able and willing to pay $1.22 for cleaning and pressing a man's suit or woman's dress will not give their business to plaintiff. Those who are unable or unwilling to pay more than 69 cents per garment will give their business to plaintiff . . .

"IX. There is a controversy between plaintiff and defendant over the validity of the orders of said Board annexed as Exhibits A, B and C. Defendant asserts that each of them is valid. Plaintiff asserts that each is invalid, upon the following grounds;

"1. Said orders, and the statutory provisions upon which they are based, are not a valid and reasonable exercise of the police power for the public benefit, but are arbitrary prohibitions in violation of due process and equal protection of the laws, under the Fourteenth Amendment, in that they result and will result only in private benefit of a small, private group of competitive cleaners and pressers. They do not benefit, but they injure by greatly higher prices, the members of the public who desire to purchase cleaning and pressing service.

"2. The delegation of price-fixing to a board of seven members of whom six are interested members of the competitive business of dry-cleaning is a vicious and unlawful delegation of legislative power.

"3. The price-fixing provisions of said orders and the statutory provisions on which they are based are invalid because of delegation of legislative power to private persons to initiate the imposition of, and to impose, a minimum price upon dissenting competitors.

"4. The statutory provisions on which said orders are based deny equal protection of the laws, under the Fourteenth Amendment, to the minority group of a non-assenting 25% under section 9563 of said Code, and the 49% group under section 9566 of said Code.

"5. The price-fixing orders . . . and the statutory provisions upon which they are based unconstitutionally deny to plaintiff the liberty of contracting with those men and women in Alameda County who are perfectly content to pay 69 cents for dry-cleaning a suit or dress and machine pressing it but do not care to have fancy wet-cleaning and hand ironing and other frills added to the service with resulting higher cost and price.

"6. The price orders . . . are invalid because they alter and enlarge the statute, upon which they purport to be based, by exceeding the powers granted under the statute to said Board."

The prayer is that the orders be declared invalid, and that preliminary and final injunctions be granted, restraining the board from enforcing or attempting to enforce the orders, or the statutory provisions on which they are based, and for general relief.

Appellant says "The trial Court entertained the conviction that any minimum price statute applicable to the dry cleaning industry would be necessarily unconstitutional and enjoined the enforcement of the minimum price provisions of said Code upon that broad ground. *The single question presented by the appeal is, therefore, the abstract constitutionality of the said minimum price provisions.*" (Emphasis appellant's.)

It does not necessarily follow, simply because the injunction issued, that the court entertained the conviction that the legislation was unconstitutional. It is to be assumed, in the absence of any record of the court's reasons, that it was issued, as preliminary injunctions usually are, merely

to maintain the *status quo* until the final determination of the case. (*Stewart* v. *Superior Ct.*, 100 Cal. 543, 545 [35 P. 156, 563]; *Tulare Irr. Dist.* v. *Superior Ct.*, 197 Cal. 649, 671 [242 P. 725]; *People* v. *Black's Food Store,* 16 Cal.2d 59 62 [105 P.2d 361]).

The effect of a preliminary injunction is explained in 14 California Jurisprudence, pages 184-5 as follows: "The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy. It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or should not be restrained from exercising the rights claimed by him. Indeed, when the cause is finally tried it may be found that the facts require a decision against the party prevailing on the preliminary application. *It therefore follows that an appellate court in passing upon the propriety of the issuance or dissolution of a preliminary injunction will not determine the merits of the case in advance of the trial,* and its decision as to the propriety of granting the writ is no intimation of what the judgment of the lower court should be at the final hearing; nor is it the law of the case in a subsequent appeal from the final judgment on the merits." (Emphasis added.)

In "balancing the respective equities of the parties" the trial court in the exercise of its discretion had to give careful consideration to the consequences of whatever action it took. On the one hand was the board. The granting of the injunction would (as it did) restrain temporarily the enforcement of its orders in 17 locations. On the other hand was the respondent. If no injunction issued the orders would be immediately enforceable and if respondent defied them *it* would be subject to injunction on the petition of the board under section 9567, and to fines of from $25 to $200 for each day's violation under sections 9590, 9591, Business and Professions Code. Hence under threat of injunction and heavy fines respondent would be forced to quit its 69-cent business and adopt the $1.22 minimum (using those figures as typical and illustrative).

Respondent alleged that "The price-fixing orders . . . and the statutory provisions upon which they are based unconstitutionally deny to plaintiff the liberty of contracting with those men and women in Alameda County who are perfectly content to pay 69 cents for dry-cleaning a suit or dress and

machine pressing it but do not care to have fancy wet-cleaning and hand ironing and other frills added to the service with resulting higher cost and price." This is but another way of saying that if the minimum price schedules were enforced respondent would lose this lower-bracket group of its customers. While awaiting trial it is conceivable that it might lose them *for all time,* even though it eventually won the case.

It may be assumed that the court concluded, after weighing such possibilities and the consequences to both sides, that appellant would suffer no unusual or serious detriment by permitting prices to "ride" as they were in these 17 communities, and that less harm all around would come by granting the injunction pendente lite than by denying it.

The injunction was issued on the verified complaint alone (see *Porters Bar Dredging Co.* v. *Beaudry,* 15 Cal.App. 751, 759 [115 P. 751]) as section 527, Code of Civil Procedure, permits. Appellant could have filed a verified answer or affidavits, but it elected to do neither. In its briefs, however, it "joins issue" on several allegations of the complaint. It states that this allegation, or that, is not true. It states that the incomplete and inferior service which respondent gives its customers is not known to the customers to be incomplete or inferior, and that therefore they are deceived into thinking they are getting $1.22 worth of service for their 69 cents. It appears to us that this treatment of the case by appellant bears out respondent's contention that the facts relating to the actual conduct, practices and usages of the trade, of which courts have no judicial knowledge, must, of necessity, be brought out at a trial, before any court can decide the ultimate question of constitutionality.

In *Kresge Co.* v. *Couzens, Mayor,* 290 Mich. 185 [287 N.W. 427, 124 A.L.R. 543] (cited by respondent), it was held that an ordinance of the city of Detroit, while ostensibly enacted in the public interest, was in fact an "unreasonable interference with the rights of citizens to carry on a legitimate business" and "an attempt to stifle competition rather than to enforce reasonable and necessary regulations." Respondent claims that such is the effect of the challenged legislation and it has alleged that the orders and the legislation on which they are based "will result only in private benefit of a small, private group of competitive cleaners and pressers" to the detriment, not the benefit, of the public.

The case of Brock, as *State Director of Agriculture* v. *Superior Court,* 12 Cal.2d 605 [86 P.2d 805] settles the ques-

tion now presented. The director, acting under the 1935 Agricultural Adjustment Act [48 Stats. 31, 7 U.S.C.A. § 601 et seq.] sought by a system of licensing and other means to limit the production of grapefruit to the end that the artificial scarcity thus resulting would elevate prices. In the main litigation certain growers obtained a temporary injunction to prevent the director from putting the plan into operation as to themselves on the ground that the measures were unconstitutional. By prohibition the director sought to compel the superior court to dissolve the temporary injunction issued in the main litigation, but the Supreme Court in an opinion which comprehensively deals with the problem— in all essentials the same as that now presented—denied the writ. The court points out that in a suit to enjoin the enforcement of legislation where the complaint tenders issues of fact touching the question of constitutionality ''The plaintiffs are entitled to the findings of a trial court upon those issues.'' In denying the writ the court held the temporary injunction to have been properly issued. At page 614 it cites numerous cases, including *Polk Co.* v. *Glover,* 305 U.S. 5 [59 S.Ct. 15, 83 L.Ed. 6], and from the latter it quotes the following:

''We think that the facts alleged in the bill were sufficient to entitle the plaintiffs to an opportunity to prove their case, if they could, and that the court should not have undertaken to dispose of the constitutional issues (as to which we intimate no opinion) in advance of that opportunity. The allegations of the bill as to trade conditions and practices, and as to the effect of the required embossing of cans, raise particular questions which can hardly be said to lie within the range of judicial notice. The salutary principle that the essential facts should be determined before passing upon grave constitutional questions is applicable. See *Borden's Farm Products Co.* v. *Baldwin,* 293 U.S. 194, 211-213 [55 S.Ct. 187, 79 L.Ed. 281], and cases cited. And that determination requires a hearing in due course upon the issues raised by the pleadings.''

See, also, *Nebbia* v. *New York,* 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469], where the court said: ''. . . a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because *the reasonableness of each regulation depends upon the relevant facts.*'' (Emphasis added.)

In the instant case appellant relies on section 3423 of the Civil Code. In the Brock case, the petitioners did likewise, but the court (p. 609) said: ''The petitioners place their principal reliance upon section 3423 of the Civil Code which provides that 'an injunction cannot be granted . . . to prevent the execution of a public statute, by officers of the law, for the public benefit.' This section has been construed as a limitation upon the power of a court to restrain public officers from enforcing a valid law (*Reclamation District* v. *Superior Court*, 171 Cal. 672 [154 P. 845]), but it has uniformly been held that one specially interested may enjoin the attempted execution of an unconstitutional statute.''

From what has been said it is clear that any discussion on this appeal, of the constitutionality of the legislation would be unnecessary as well as inconsistent with the reasons which we have already given.

The injunction, in addition to halting the enforcement of the orders contained in appendices A, B and C in the 17 communities, enjoined, as to the plaintiff, the establishing of *any* minimum price schedules under sections 9563 through 9566. The injunction includes by its terms action which may not interfere in the least with plaintiff's business. As far as the present case is concerned, plaintiff can complain only of orders already made which affect its business.

Accordingly, the trial court is directed to modify the injunction by striking therefrom the words:

''and are further restrained and enjoined from establishing any minimum price schedules pursuant to the provisions of Sections 9563 through 9566 of the Business and Professions Code of the State of California.''

As so modified the order appealed from is affirmed, each party to pay its own costs on appeal.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 14, 1949.