**Patrick J. O'HANLON, Individually and as Administrator of the Estate of Brian O'Hanlon, Plaintiff,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Connecticut Corporation, et al., Defendants.**

Civ. A. No. 76–59.

United States District Court,
D. Delaware.

Oct. 2, 1978.

962

David Roeberg of Roeberg & Agostini, P.A., Wilmington, Del., for plaintiff.

F. Alton Tybout of Tybout & Redfearn, Wilmington, Del., for defendant Insurance Company of North America.

## OPINION

STAPLETON, District Judge:

The sole question now before the Court is whether Section 3902 of Title 18 of the Delaware Code, pertaining to uninsured motorist insurance, applies to an excess liability insurance policy which, up to a limit of $1,000,000, insures the policy holder, *inter alia*, for bodily injury, death and property damage liability to a third party in excess

of the $100,000/$300,000 retained limits of primary coverage. This issue was raised earlier on cross-motions for summary judgment. Although there was no dispute at that time regarding any relevant adjudicative facts, I nevertheless concluded that disposition of this issue should await a fuller development of the record.[1] An evidentiary hearing was subsequently held at which the parties were afforded the opportunity to present any evidence which might shed light on the "legislative facts" surrounding the enactment of Section 3902.

Legislative facts are "those which have relevance to legal reasoning and the law-making process, whether in the formulation of a legal principle or ruling by a judge . . . or in the enactment of a legislative body."[2] Advisory Committee Notes to Federal Rule of Evidence 201. The Federal Rules of Evidence prescribe no procedure by which courts are to go about receiving information regarding legislative facts, but the approach discussed there "leave[s] open the possibility of introducing evidence through regular channels in appropriate situations." Advisory Committee Notes to Federal Rule of Evidence 201.

Courts regularly and inevitably engage in findings of legislative facts. While these facts are not normally developed through the presentation of evidence,[3] there are instances when access to the pertinent data is most appropriately received through live testimony presented by the parties. This is one of those cases.

When a court is attempting to ascertain information relating to the marketing practices of an industry at a point in time, and to draw inferences from those practices re-

---

1. *O'Hanlon v. Hartford Accident & Indemnity Co.*, 439 F.Supp. 377, 387 (D.Del.1977).

2. *See also, United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976). Another definition of "legislative facts" is offered in Davis, 2 *Administrative Law Treatise* (1958 ed.), § 15.03, p. 353:

   Legislative facts are the facts which help the tribunal determine the content of law and of policy and help the tribunal to exercise its judgment or discretion in determining what course of action to take. Legislative facts

   are ordinarily general and do not concern the immediate parties.
   *See also*, Davis, *Judicial Notice*, 55 Colum.L.R. 945, 952–9 (1955).

3. *See* Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv.L. Rev. 364, 404–7 (1942); Davis, 2 *Administrative Law Treatise* (1958 ed.), § 15.03, pp. 354–360. As Davis says in his *Administrative Law Treatise* (1970 Supp.), § 15.03, p. 528:

   A trial is normally required for finding facts about parties, but a tribunal may go anywhere to get facts used for molding law.

garding the intent of the legislature in fashioning legislation, the relevant data is most readily available through witnesses familiar with those practices.[4] Those witnesses not only can provide information through direct examination, but are also available for cross-examination [5] and to answer any inquiries which the Court might have. For these reasons, I agree that "[o]nce the court decides to advise itself in order to make new law, it ought not add to the risk of a poor decision by denying itself whatever help on the facts it can with propriety obtain." 1 Weinstein and Berger, *Weinstein's Evidence* (1977 ed.), ¶ 2000[03], p. 200–16.

The hearing held in this case fulfilled its purpose. As the remainder of this Opinion will demonstrate, the evidence of legislative facts submitted at that time was of substantial assistance in understanding and resolving the issue before the Court.[6]

When originally enacted in 1967, subsections (a) and (b) of Section 3902 read as follows:

§ 3902. *Uninsured vehicle coverage; insolvency of insurer*

(a) No policy insuring against liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this State unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages, from owners or operators of uninsured or hit-and-run motor vehicles, for bodily injury, sickness or disease, including death, resulting from the ownership, maintenance, or use of such uninsured or hit-and-run motor vehicle. Except, that no such coverage shall be required in or supplemental to a policy where rejected in writing, on a form furnished by the insurer describing the coverage being rejected, by an insured named therein; or upon any renewal of such policy unless the coverage is then requested in writing by the named insured. The coverage herein required may be referred to as "uninsured vehicle coverage."

(b) The amount of coverage to be so provided shall be not less than the minimum limits for bodily injury liability insurance provided for under the motorist financial responsibility laws of this State.

In 1971 the General Assembly amended subsection (b) to read as follows:

(b) The amount of coverage to be so provided shall not be less than the maximum [7] limits for bodily injury, death and property damage liability insurance provided for under the motorist financial responsibility laws of this State. The

---

4. In *Borden's Co. v. Baldwin*, 293 U.S. 194, 210, 55 S.Ct. 187, 192, 79 L.Ed. 281 (1934), the Supreme Court said:

. . . where the legislative action is . . . challenged, and a rational basis for it is predicated upon the particular economic facts of a given trade or industry, which are outside the sphere of judicial notice, these facts are properly the subject of evidence and of findings. With the notable expansion of the scope of governmental regulation, and the consequent assertion of violation of constitutional rights, it is increasingly important that when it becomes necessary for the Court to deal with the facts relating to particular commercial or industrial conditions, they should be presented concretely with appropriate determinations upon evidence, so that conclusions shall not be reached without adequate factual support.

5. It has been suggested that each party must have the opportunity to influence the Court's findings of legislative facts in order to comport with due process. Davis, *Administrative Law of the Seventies* (1976 ed.), pp. 364–5.

6. The evidence submitted included testimony from Professor Alan I. Widiss concerning the historical development of uninsured motorist insurance statutes, from Arnold Olsen of the Delaware Insurance Commissioner's Office regarding the 1971 amendment to Delaware's uninsured motorist insurance statute, and from David W. Detwiler, an insurance policy underwriter with the Insurance Company of North America concerning the marketing practices with regard to excess liability insurance policies.

7. This change from "minimum" to "maximum" appears to have been inadvertent. The parties agree that the reference in both instances was to the amount of liability insurance required by Delaware's financial responsibility law.

coverage for property damage shall be subject to a $250 deductible for property damage arising out of any 1 accident unless the insurer and the insured agree in writing to a different deductible. Each insured shall be offered the option to purchase additional coverage for personal injury or death up to a limit of $300,000, but not to exceed the limits for personal injury set forth in the basic policy.

As used herein, the term "property damage" shall include the loss of use of a vehicle.

These subsections read in this way in February of 1974 when the excess or "umbrella", liability policy involved in this case was issued.

As this Court noted in its earlier Opinion,[8] while this policy provides a number of coverages other than its excess automobile liability coverage, it nevertheless is a policy which also insures against "liability arising out of the ownership, maintenance or use" of a motor vehicle, which was delivered in this state, and which had the effect of insuring liability arising from vehicles registered in Delaware. Section 3902 can thus be read to cover the policy here at issue. The background, evolution and purpose of the statute, as well as industry practice at the time of its enactment, however, lead me to reject this reading.

Uninsured motorist coverage ("UM coverage") was first conceived in the mid-50's as an alternative to a proposed compulsory liability insurance statute in the State of New York. The New York legislature ultimately adopted a compulsory liability insurance approach without an uninsured motorist feature, but the casualty insurance industry thereafter began to offer UM coverage, in connection with the issuance of standard automobile policies, the limits of which corresponded to the minimum amount of liability insurance required by the financial responsibility laws of the particular state. Gradually, each of the fifty states thereafter enacted legislation in some form which required the issuance of UM coverage with automobile liability policies. In every instance, the minimum limits required corresponded with the amount of liability coverage required by the state's financial responsibility laws.

Delaware took this step in 1967. The single purpose of that original uninsured motorist statute is reflected in my earlier Opinion:

> . . . the concern which prompted this statute was the plight of individuals who suffer injury or damage at the hand of one from whom compensation for that injury or damage cannot be secured. The legislature sought to encourage insurance protection for such individuals. Section 3902 . . . requires that uninsured motorist coverage in a minimum amount be included in all liability insurance policies issued with respect to Delaware vehicles unless the insured rejects the coverage in writing. . . .
>
> The . . . function of the statute is to set a floor on the amount of coverage required in the absence of a written waiver. This floor has been established by reference to the State's financial responsibility statute . . . .
>
> \* \* \* \* \* \*
>
> . . . Reading the two statutes together, I conclude that Section 3902 creates a scheme whereby any individual who does not expressly opt out in writing will be assured of the same minimum pool of resources from which to seek compensation for injuries inflicted by an uninsured motorist as he would have in the event of injuries inflicted by a person having the minimum coverage permitted under Delaware law—that is, $10,000.
>
> . . .

*O'Hanlon v. Hartford Acc. & Indem. Co.,* 439 F.Supp. 377, 382–3 (D.Del.1977).

Any excess liability insurance policy which includes automobile liability coverage, by definition, assumes the existence of primary, third party, automobile liability insurance. In any state which has an unin-

---

8. 439 F.Supp. 377 at 386.

sured motorist insurance statute such as Section 3902, the existence of primary third party automobile liability insurance assumes either the existence of UM coverage equivalent in amount to the liability coverage mandated by the financial responsibility law or a written waiver of that coverage. Thus, in any situation involving the issuance of an excess liability policy, the limited objective of the 1967 statute would already have been fulfilled before the issuance of that policy. This fact suggests the desirability of a closer look at the text of the 1967 statute to see if there is a possible reading of Section 3902 other than that requiring UM insurance coverage to be offered in connection with excess liability policies which would better correlate with its purpose.

The policies covered by Section 3902 not only must insure against "liability arising out of the ownership, maintenance, or use of" a motor vehicle and be "delivered or issued for delivery in this State", they must also be issued or delivered "with respect to . . . [a] vehicle registered or principally garaged in this State". The preferred construction of this statute should be one which gives purpose and effect to the third definitional clause as well as to the first two. When viewed in the light of existing industry practice, this third clause takes on significance.

At the time of the enactment of this statute, and continuing to the present, the consistent practice in the casualty insurance field has been to issue primary automobile liability insurance with respect to specific vehicles whose serial numbers, registration and location are identified in the policy. Excess insurance policies, on the other hand, were (and are) issued with coverage for liability of named insureds and other protected parties without being tied to specific vehicles. Thus, this third clause, as well as the overall legislative purpose, suggests that Section 3902 was directed only toward primary automobile insurance policies.[9]

Because of the relationship of the original statute to the financial responsibility laws and the otherwise unaccountable use of the "with respect to" clause, I conclude that the 1967 statute was not intended to apply to excess liability policies of the type here in issue.

While the 1971 amendment to the statute broadens and complicates the State's regulatory program with respect to uninsured motorist coverage, my conclusion with respect to the original statute dictates a similar conclusion with respect to the amended statute. This is so primarily because nothing in the amendment suggests an intention to expand the category or categories of policy included within the sweep of the statute. Indeed, the inference to be drawn is that no change in this area was intended. Subsection (a)'s description of the covered policies remains unchanged and the new requirement that additional UM coverage be offered is added to a subsection which had theretofore been intended to apply to primary automobile liability policies only.

In addition, an interpretation of the amended Section 3902 which limits its operation to primary automobile liability insurance policies produces a rational legislative scheme which serves the legislative objectives of the original statute and amendment.

In the last half of the 60's and first part of the 70's, the most common primary automobile liability policy had limits of $100,000 per person and $300,000 per incident, if a split limit policy, and $300,000, if a single limit policy. During the same period, almost all carriers who issued excess liability insurance would not write such coverage with retained limits (i. e. primary insurance in force) of less than $100,000 per person and $300,000 per incident.

The purpose of the 1971 amendments was to give an insured the opportunity to pro-

---

**9.** Perhaps because the language of the third clause has a specialized meaning in the industry, all of the carriers, as well as the Office of the Insurance Commissioner of Delaware, as-

sumed that Section 3902 did not apply to excess liability policies. The record does not affirmatively show that the issue was specifically considered, however.

tect himself or herself from the risk posed by an uninsured driver to the same extent he or she protects others through liability insurance or to the extent of $300,000, whichever is less.[10] It is reasonable to infer that the $300,000 limit was selected because it corresponded with the most common contemporary judgment on what was adequate coverage for injuries or death occasioned by motor vehicle ownership, maintenance, or use. If it was the legislative thought that an insured should be guaranteed the right to purchase UM coverage in accordance with his or her own assessment of adequate coverage up to the prevailing community judgment, limiting the scope of Section 3902 to exclude excess liability policies is not detrimental to the legislative objective. As earlier noted, when excess coverage is bargained for, primary liability coverage, by definition, is already in force. In 1971, excess insurance was not widely available without $100,000/$300,000 of primary coverage being in force. Thus, in almost all situations where excess coverage was being offered in 1971, the prospective insured under the amended statute would already have been offered $100,000/$300,000 in UM coverage before the issuance of an excess policy.

It is true, as the plaintiff urges, that it may be desirable to be able to secure UM coverage in excess of $100,000/$300,000 primary coverage. The statute leaves that possibility open to private negotiation. But the issue here before the Court is what the General Assembly intended to *require* casualty insurance carriers to offer to their customers and I find no evidence that it intended to impose a requirement of UM coverage as a prerequisite to the issuance of excess liability insurance.

It is also true that one can hypothesize about schemes to circumvent the statute through the use of low limit primary policies combined with excess policies having low retained limits. These hypotheticals, however, pose problems which are more ac-

ademic than real[11] and it is doubtful that they played a role in the formulation of the legislative judgment embodied in Section 3902 as amended.

In summary, I conclude that Section 3902 of Title 18 of the Delaware Code does not apply to an excess or umbrella liability insurance policy issued in Delaware even though the insured owns motor vehicles registered or garaged in Delaware and one of the coverages of the policy protects against liability arising from the ownership, maintenance or use of an automobile.

Submit order.

---

**10.** 439 F.Supp. 377 at 383.

**11.** The record indicates that the policies necessary to execute these schemes are, for the most part, unavailable.