was valid. The act in question in *Burton v. Koch*, like the legislation now before us, was designed to change the composition of the school board in Detroit. The opinion in *Burton v. Koch* states that the act's "expressed purpose is that, in districts co-extensive with a city having a population of 250,000 or more [Detroit only] the board of education shall consist of seven members elected at large . . . ." 184 Mich. 255-56. By such legislation, the Michigan Legislature altered Detroit's board of education. The Court said that there was no need for "a referendum to determine whether it shall or shall not be effective . . . because the act is not local in character." 184 Mich. 256. The Supreme Court of Michigan has not overruled the case on this point, nor did the Constitutional Convention of 1963, or a later legislature. *Burton v. Koch* answers the state-law home rule issue now before us.

I agree with the Court that *Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999), is directly in point and necessarily controls the outcome of this case under the Voting Rights Act. For these reasons, I would affirm the judgment of the District Court.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0204P (6th Cir.)
File Name: 02a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

HELEN MOORE, et al.,
    *Plaintiffs-Appellants,*

    *v.*

DETROIT SCHOOL REFORM BOARD; DAVID ADAMANY; DENNIS W. ARCHER, Mayor of the City of Detroit, and JOHN ENGLER, Governor of the State of Michigan,
    Defendants-Appellees.

No. 00-2334

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 99-74438—Nancy G. Edmunds, District Judge.

Argued: May 3, 2002

Decided and Filed: June 12, 2002

Before: MERRITT, SUHRHEINRICH, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** George B. Washington, SCHEFF & WASHINGTON, Detroit, Michigan, for Appellants. Jerome R. Watson, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, Thomas R. Wheeker, OFFICE OF THE ATTORNEY GENERAL, TORT DEFENSE DIVISION, Lansing, Michigan, for Appellees. **ON BRIEF:** George B. Washington, Miranda K.S. Massie, SCHEFF & WASHINGTON, Detroit, Michigan, for Appellants. Jerome R. Watson, Richard J. Seryak, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, Thomas R. Wheeker, OFFICE OF THE ATTORNEY GENERAL, TORT DEFENSE DIVISION, Lansing, Michigan, for Appellees. John F. Royal, Detroit, Michigan, Michael J. Steinberg, Kary L. Moss, AMERICAN CIVIL LIBERTIES UNION, Detroit, Michigan, for Amici Curiae.

GILMAN, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. MERRITT, J. (pp. 35-36), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. Five citizens of Detroit and ten organizations representing students, teachers, and other residents of the city brought this lawsuit to challenge the validity of the Michigan School Reform Act (MSRA). They sued the Detroit School Reform Board (Reform Board), David Adamany, the former chief executive officer of the Detroit Public School System (DPS), Dennis Archer, the mayor of Detroit, and John Engler, the governor of Michigan. The MSRA created an appointed school board to govern the DPS and eliminated the authority of its elected school board. According to the plaintiffs, the MSRA violates

———————————

**CONCURRENCE**

———————————

MERRITT, Circuit Judge, concurring. I agree with the result reached by the Court. But the length and elaborateness of the Court's opinion, to some extent, disguises rather than reveals the clarity of the law we must follow. The law offers us no leeway here to decide the case otherwise.

On the Michigan home rule issue, we must follow state law. Michigan law is clear that the state legislature may change the composition and governance of the Detroit school board by statute. And we have already decided the Voting Rights Act issues raised here in our recent case upholding Ohio's same statute changing the Cleveland school board.

The home rule provision of the Michigan Constitution of 1963, Article 7, § 22, states that each municipality has the power to adopt a city charter and to adopt "ordinances related to its municipal concerns, property and government, subject to the Constitution and law." The education article of the Michigan Constitution, Article 8, then provides in § 2 that "the legislature shall maintain and support a system of free public elementary and secondary schools as defined by law." The legislative branch provisions in Article 4 state at § 29 that the legislature "shall pass no local or special act in any case where a general act can be made applicable" unless "approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." These provisions come from the earlier Michigan Constitution of 1908.

Under Michigan law we have no alternative but to uphold the validity of the Michigan legislation now before us. The case of *Burton v. Koch*, 184 Mich. 250, 151 N.W. 48 (1915), is directly in point. In *Burton v. Koch,* the Michigan Supreme Court held that legislation, Act No. 251, Public Acts of 1913, applicable only to the school system in the City of Detroit,

Many of the state senators who supported the MSRA indicated that they perceived a crisis in the DPS and believed that a need for immediate action existed. They recognized that the MSRA was an experiment of sorts, but felt compelled to take the risk of the unknown rather than continue with a system that appeared to be failing. The Equal Protection Clause does not prohibit such experimentation where no suspect classification or fundamental right is involved. *Mixon*, 193 F.3d at 403 ("State legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test."); *Hearn*, 185 F.3d at 775 ("The crisis [the Illinois Legislature] perceived in Chicago also was a legitimate reason to take immediate action there, leaving open the possibility of extending similar measures to other places.").

For the preceding reasons, we conclude that the plaintiffs have failed to state a claim for violations of either the Fourteenth or the Fifteenth Amendment to the United States Constitution, or of the Equal Protection Clause of the Michigan Constitution. The district court therefore did not err in granting summary judgment to the defendants on these claims.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

(1) the Michigan Constitution's requirements for local legislation, (2) § 2 of the Voting Rights Act, and (3) the Fourteenth and Fifteenth Amendments to the United States Constitution and similar provisions of the Michigan Constitution. The district court granted summary judgment in favor of the defendants. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

### I. BACKGROUND

#### A.   Factual background

In March of 1999, the Michigan legislature enacted the MSRA. This legislation amended Michigan's Revised School Code (School Code) by providing for the appointment of a seven-member school reform board in qualifying school districts. Mich. Comp. Laws § 380.372. Any "first class school district," defined as a district with more than 100,000 students, is a qualifying school district and thus subject to the MSRA's provisions. *Id*. §§ 380.371(c), 380.402. Only the DPS, which had approximately 180,000 enrolled students when the MSRA was enacted, currently meets this prerequisite. Grand Rapids, with about 27,000 students at the time the MSRA was passed, has the next largest school district in Michigan.

The MSRA requires the mayor of any city in which a qualifying school district is located to appoint six of the seven members of the school reform board. *Id*. § 380.372(2). Either the state superintendent of public instruction or that officer's designee serves as the seventh member of the board for the first five years of its operation. After the initial five-year period, the mayor appoints the seventh member. *Id*. With the exception of the initial state superintendent, the mayor has the authority to remove board members for any reason. *Id*. § 380.372(4).

Any person who is serving as an elected member of the school board when the transition from the elected to the appointive system occurs is not eligible to become a member

of that district's school reform board.  *Id*. § 380.372(3). Although the MSRA suspends the duties and authority of the elected school board, its members may continue to meet and serve in an advisory role until their terms of office expire.  *Id*. § 380.373(1).  But they are not entitled to compensation or reimbursement for any work that they do.  *Id*.

The MSRA requires a school reform board to choose a chief executive officer (CEO).  *Id*. § 380.374.  Although the CEO serves at the will of the reform board, he or she has all of the authority and assumes all of the duties that the School Code confers upon elected school boards.  *Id*. §§ 380.373(4), 380.374.  The state superintendent of public instruction or that person's designee has the ability to veto the school reform board's choice of a CEO.  *Id*. § 380.374(1).  Five years after the appointment of a school reform board, the citizens of a qualifying school district are able to vote to determine whether to retain the reform board, the CEO, and the structure established by the MSRA.  *Id*. § 380.375.

Prior to the enactment of the MSRA, the elected Detroit Board of Education (Detroit school board) requested that New Detroit, Inc., which is a coalition of community, business, labor, education, and religious leaders, conduct an independent and impartial review of the DPS.  New Detroit convened a panel (Review Panel) consisting of a representative group of community leaders to prepare its report, which it submitted to the Detroit school board in July of 1997.  The Review Panel recommended "a complete and fundamental restructuring of the school system's management and internal operations."  In addition, the report recognized the need for immediate action, noting that "the DPS must launch its restructuring without delay and continue the hard work consistently for years to come.  Failure to take decisive action now will further erode the system's credibility and, eventually, cost it the community's faith and backing."

The Detroit school board adopted the report two weeks later and appointed a seven-member team to implement the

likely overstated the problem.  Former Chief Financial Officer Aldridge discussed the extra expenditures that the DPS had to make to address its unique circumstances, and he noted the budget surplus at the end of fiscal year 1997-1998.  The plaintiffs also counter the accusations of various incidents of extravagant spending by noting that the scandals had occurred many years ago and resulted in the elected board members who spent excessively being voted out of office.

Despite these challenges, we conclude that the MSRA is rationally related to a legitimate government interest.  The Michigan Legislature was entitled to believe that the MSRA would address the problems that the legislators perceived to exist in the DPS.  Indeed, the very size of the Detroit school district as compared to other districts—180,000 students versus 27,000 students for the next largest system—provides a rational basis for adopting a different approach to governance.  *Hearne*, 185 F.3d at 774-75 ("With respect to public schools, it was entirely rational for the legislature to believe that the logistics of running a school system designed to serve 431,085 students (the number of students enrolled in Chicago's public schools for the 1997-98 school year) were far different from those implicated in systems serving less than a tenth of that number.").  Although the plaintiffs would have preferred the Legislature to consider studies that established correlations between socio-economic factors and problems such as low test scores and high dropout rates, its alleged failure to do so does not render the MSRA unconstitutional.  The plaintiffs' arguments might demonstrate that the MSRA would not meet the narrow-tailoring requirement of strict scrutiny, but the rational-basis standard does not require detailed factual findings in support of challenged legislation.  *FCC v. Beach Communications*, 508 U.S. 307, 315 (1993) (explaining that under the rational basis standard, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data").

the Detroit school board is a legislative body that Detroit's citizens have a fundamental right to elect, but they insist that they will pursue this argument if this court considers the matter en banc or if the Supreme Court grants certiorari.) They continue to insist, however, that the MSRA fails to survive rational-basis review because (1) it was enacted on the basis of "anecdotes collected from newspapers" rather than any specific factual findings or relevant studies, and (2) it effectively transferred complete control of the DPS to the state, because the state superintendent, who is not accountable to Detroit citizens, has veto power over the reform board's decisions.

Before evaluating the plaintiffs' equal protection challenge under the rational-basis test, we note the contention raised by several of the *amicus curiae* that the MSRA infringes upon the fundamental right of Detroit parents to direct the education of their children. The plaintiffs did not raise this argument in the district court, nor does it appear in their original or amended complaint. "This court does not normally address issues raised for the first time on appeal." *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1072 (6th Cir. 1993). Although the rule is discretionary, this court "has adhered to the rule except in exceptional cases or particular circumstances or when the rule would produce a plain miscarriage of justice." *Id.* (internal quotation marks and citations omitted). We see no reason to depart from the general rule in the present case. As a result, we decline to address the belated argument that the MSRA infringes upon the fundamental right of Detroit parents to direct the education of their children.

The plaintiffs present a considerable amount of evidence to refute the reasons given by the state senators and representatives for enacting the MSRA. Specifically, Dr. Gibson and Dr. Haney both expressed their beliefs that the lower MEAP test scores among Detroit students reflected their socio-economic status, not flaws in the school system. Dr. Gibson also explained why the dropout rates for the DPS

Review Panel's recommendations. An assessment of the DPS's progress toward achieving these initial goals was presented by the Review Panel the following year. After acknowledging that progress had been made in reaching several of the original objectives, the Review Panel expressed its view that "[t]he structure of DPS and the nature of the restructuring challenges, however, have significantly slowed the pace of action on many of the major objectives."

During the Michigan legislative debates over the MSRA, several amendments were offered that would have allowed Detroit's citizens to vote by referendum on whether to approve the legislation. None of these amendments were adopted. The Michigan Senate approved the MSRA by a vote of 30 to 7, with 3 of the 7 opposing votes coming from Detroit's 5 senators. In the Michigan House of Representatives, the vote was 66 to 43 in favor of the MSRA, with all of Detroit's representatives opposing it.

Senator Daniel DeGrow, the chief sponsor of the MSRA, explained why he supported the act in a speech on the Senate floor. In particular, he believed that because the DPS had 180,000 students, its deficiencies affect the entire state of Michigan. He explained that the MSRA was designed to effect a "fundamental change" that would provide the students in the DPS with "the opportunity to achieve a quality education." According to Senator DeGrow, the elected school board's refusal to take crucial actions had effectively denied Detroit's students any meaningful educational opportunity.

Many of the other state senators echoed these sentiments. The most common reasons for their decisions to support the MSRA were the low graduation rates in the DPS—only 30 percent of the entering class proceeded to graduation—and the failure of Detroit students to obtain satisfactory scores on the standardized Michigan Educational Assessment Profile (MEAP). Several senators also faulted the elected school board for failing to use the proceeds of a $1.5 billion bond program for needed improvements to the DPS. In addition,

they identified extravagant expenditures made by the elected board members that included the use of chauffeured limousines and extensive foreign travel.

The Reform Board selected Dr. David Adamany to be its CEO in May of 1999. Dr. Adamany served as CEO until June 30, 2000. The Reform Board then appointed Dr. Kenneth Burnley to replace Dr. Adamany, with Dr. Burnley's term beginning on July 1, 2000.

By amendments that became effective in June of 2000, the Michigan Legislature altered the language of several provisions in the MSRA. These amendments added more general, open-ended terms to replace language that might have been interpreted to preclude other school districts from becoming subject to the MSRA's provisions as their student enrollments increase. In the amended version of the MSRA, the Legislature specified that the changes were added "to reaffirm the legislature's initial intent to apply [the MSRA] . . . to any school district that was a qualifying school district . . . at the time of enactment of [the MSRA] or that may hereafter become a qualifying school district." 2000 Mich. Pub. Acts No. 230.

## B.   Procedural background

The plaintiffs filed this lawsuit in the United States District Court for the Eastern District of Michigan in September of 1999. An amended seven-count complaint was filed five months later. The first two counts allege that the MSRA violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and a similar provision in the Michigan Constitution by denying Detroit's citizens the right to vote for their city's school board and by prohibiting Detroit's elected school board members from being appointed to the Reform Board. Count III alleges that the MSRA deprives Detroit's citizens of the right to vote on the basis of their race, in violation of Section 2 of the Voting Rights Act of 1965. The fourth count contends that the

the MSRA does not deprive voters living in four other predominantly African-American school districts in Michigan of the right to elect their school board members. This fact suggests that the Michigan legislators sought to address a problem that they perceived to exist in school districts with large populations, not that they wanted to disenfranchise African-Americans. *See Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 776 (7th Cir. 1999) (rejecting the Equal Protection Clause challenge brought by teachers and other tenured employees of the Chicago Board of Education who were terminated under procedures established by state statutes that applied solely to Chicago, noting that "[t]here are substantial numbers of African Americans in many other cities in the state, and it is simply too great a stretch to say that the population represented by the Chicago school system is such a good proxy for African Americans that the ostensibly neutral classification is an obvious pretext for racial discrimination") (internal quotation marks and citation omitted).

We thus conclude that the plaintiffs have failed to establish that an impermissible discriminatory purpose motivated the Legislature to enact the MSRA. As a result, the plaintiffs have failed to state a claim under the Fifteenth Amendment. Moreover, because the MSRA does not infringe upon any fundamental right, our conclusion that the MSRA does not constitute racially discriminatory legislation eliminates the necessity of applying strict scrutiny to the plaintiffs' Equal Protection Clause challenge under the Fourteenth Amendment.

The second basis for the plaintiffs' challenge under the Equal Protection Clause is their contention that the MSRA is not rationally related to any legitimate government interest. Although the plaintiffs originally argued that the MSRA had to withstand strict scrutiny because it allegedly infringed on their fundamental right to elect members of the Detroit school board, they do not pursue this contention on appeal. (The plaintiffs recognize that *Mixon* refutes their contention that

The plaintiffs insist that, in addition to this evidence of disproportionate impact, the legislative process surrounding the enactment of the MSRA supports a finding of intentional discrimination. In particular, they complain about the Legislature's (1) speedy passage of the MSRA, (2) disrespectful treatment of Detroit's elected senators and representatives, (3) failure to gather and analyze relevant information before voting on the MSRA, (4) refusal to hold hearings in Detroit, (5) rejection of amendments that would have used a standard other than school-district population to define qualifying school districts, (6) selection of reform measures that allegedly fail to address the real problems with the DPS, and (7) reliance on a scandal that occurred many years before to justify its actions.

These complaints, rather than constituting evidence of a discriminatory motive, indicate a general dissatisfaction with the legislative process that preceded the enactment of the MSRA. Allegations that the Legislature acted with haste and did not engage in extensive fact-finding might be a legitimate and even a valid critique of its behavior, but it does not lead to an inference of racial discrimination. Similarly, the Legislature's rejection of amendments and choice of methods to address the perceived problems of the DPS is simply the operation of the democratic process. Although the plaintiffs object to the outcome, they offer neither direct nor circumstantial evidence that would support a finding of impermissible motives. They do not, for example, present any comparisons to show that the Legislature's actions and procedures with respect to the enactment of the MSRA differed in any manner, let alone in a material way, from its handling of other legislation. Nor do they present any historical background that would suggest a desire to discriminate against African-Americans.

Moreover, nothing in the legislative history indicates that any of the state senators or representatives had the goal of preventing African-Americans from being able to elect the members of their local school boards. As the defendants note,

MSRA violates the Fourteenth and Fifteenth Amendments to the United States Constitution and the Equal Protection Clause of the Michigan Constitution because it was allegedly enacted with the intent of denying Detroit's citizens the right to vote on account of their race. Count V challenges the MSRA on the ground that it conflicts with Article 4, Section 29 of the Michigan Constitution (Article 4) because it was a local act that was not approved by both a two-thirds vote of the Michigan Legislature and a majority vote of Detroit's citizens. The sixth count alleges that the MSRA deprived Detroit's citizens of their right to elect a school board in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and a similar provision in the Michigan Constitution. Finally, the plaintiffs contend in Count VII that the defendants violated the First Amendment to the United States Constitution by, among other things, penalizing Detroit's voters for opposing the plans of Governor Engler and Mayor Archer.

The plaintiffs presented the affidavits and deposition testimony of various individuals in support of their claims. They offered, for example, the deposition testimony of William Aldridge, the former chief financial officer of the school system, in an attempt to show that the MSRA failed to address the financial problems confronting the DPS. Aldridge stated that the DPS required higher expenditures than other school districts because of the costs associated with providing security, transportation, free or reduced lunch programs, and mental health professionals, and that its students faced unique challenges.

The plaintiffs also attempted to discredit the purported justifications for enacting the MSRA—including Detroit's high dropout rate and low test scores—through the affidavit of Dr. Richard Gibson, who was an Assistant Professor of Education at Wayne State University when the MSRA was passed. According to Dr. Gibson, the high dropout rates of the DPS are misleading because they treat students who move to other school districts as dropouts. This practice, in Dr.

Gibson's view, artificially inflates the dropout rates between poor urban school districts like Detroit and more affluent school systems, because students in the former tend to move more frequently than do those in the latter. Dr. Gibson acknowledged, however, that national research has shown that poor urban school districts, especially those with large minority-student populations, have above-average dropout rates. Because social factors such as economic need and the perceived lack of educational and employment opportunities in the urban districts contribute to these dropout rates, Dr. Gibson expressed his belief that urban school districts should not necessarily be blamed for elevated dropout rates.

Both Dr. Gibson and Dr. Walter Haney, a Professor of Education at Boston College, discussed the strong correlation between the MEAP scores and the socio-economic status of the population within each school district. Dr. Haney performed a statistical analysis comparing the MEAP scores of various school districts in Michigan. He concluded that the extreme poverty of many residents in Detroit's school district accounted for the lower MEAP scores of its students. Similarly, Dr. Gibson expressed his opinion that additional resources would be necessary to improve the MEAP scores of Detroit's students.

The plaintiffs also introduced evidence to counter the perception that the DPS faced a financial crisis. Specifically, they pointed out that the district had a $93 million budget surplus at the end of the 1997-1998 fiscal year. Although the plaintiffs recognized that the state had refused to authorize the use of the proceeds of a $1.5 billion school bond program because of disputes with the elected school board, they pointed out that the chauffeured limousine scandal had occurred 20 years before and that the board members who had been involved in this incident were voted out of office. The elected school board members who had spent money on foreign travel and other excessive items were similarly voted out of office.

purpose or object," or "is unexplainable on grounds other than race." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (internal quotation marks and citations omitted) (setting forth the standards for Fourteenth Amendment Equal Protection Clause challenges); *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997) (*Bossier Parish I*) (recognizing that both the Fourteenth and Fifteenth Amendments require a plaintiff "to establish that the State or political subdivision has acted with a discriminatory purpose"). Proving that a law has a racially disparate impact, without more, is therefore insufficient to establish a violation of either the Fourteenth or the Fifteenth Amendment. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (concluding that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact").

In *Village of Arlington Heights*, the Supreme Court identified five factors that are relevant for determining whether facially neutral state action was motivated by a racially discriminatory purpose: (1) the impact of the official action on particular racial groups, (2) the historical background of the challenged decision, especially if it reveals numerous actions being taken for discriminatory purposes, (3) the sequence of events that preceded the state action, (4) procedural or substantive departures from the government's normal procedural process, and (5) the legislative or administrative history. *Id*. at 266-68.

Neither side disputes that the MSRA has a substantial impact on African-American citizens. Specifically, Detroit's population is nearly 80 percent African-American, and about 60 percent of Michigan's African-American residents live in Detroit. The DPS has an even higher percentage of African-Americans, with over 90 percent of its student population belonging to this minority group. As noted above, however, this disparate impact alone is insufficient to establish invidious racial discrimination.

that under the Equal Protection Clause of the Fourteenth Amendment, "[c]lassifications based on race or national origin, and classifications affecting fundamental rights are given the most exacting scrutiny") (internal citations omitted). This level of review demands that the statute be "narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Laws that do not involve suspect classifications and do not implicate fundamental rights or liberty interests, in contrast, will be upheld if they are "rationally related to a legitimate state interest." *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000). "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 319-20 (1993); *see Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 484 (6th Cir. 1999) ("On rational-basis review, a classification bears a strong presumption of validity and 'a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.'") (quoting *FCC v. Beach Communications*, 508 U.S. 307, 315 (1993)).

The Equal Protection Clause of the Michigan Constitution requires the same differential tiers of scrutiny for evaluating legislation. *Doe v. Dept. of Social Services*, 487 N.W.2d 166, 170-71, 174 (Mich. 1992) (explaining that Michigan's Equal Protection Clause requires strict scrutiny for legislation involving racial classifications or fundamental rights, but that rational-basis review applies where no suspect classification or fundamental right is involved).

Turning first to the plaintiffs' racial discrimination claim, the MSRA does not contain any explicit racial classification. Where facially neutral legislation is challenged on the grounds that it discriminates on the basis of race, the enactment will be required to withstand strict scrutiny only if the plaintiff can prove that it "was motivated by a racial

In August of 2000, CEO Adamany, Mayor Archer, and the Reform Board filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Governor Engler followed suit with a separate motion for summary judgment that was filed two days later. Later that month, the plaintiffs filed their own motion for partial summary judgement.

After conducting a hearing on the parties' motions, the district court granted summary judgment in favor of the defendants in October of 2000. The court concluded that the MSRA (1) was not subject to the requirements of Article 4, because it was not local legislation, (2) did not violate § 2 of the Voting Rights Act, because § 2 applies only to elective systems, (3) survived the plaintiffs' equal protection challenges, because it was rationally related to the purpose of improving Detroit's schools and did not infringe upon any fundamental rights or constitute racially motivated legislation, and (4) was not prohibited by the Fifteenth Amendment, because the plaintiffs failed to establish that a discriminatory purpose motivated the enactment of the legislation. In addition, the court dismissed the plaintiffs' First Amendment claims for lack of standing and because the plaintiffs possessed no fundamental right to elect the school board members or to retain elected officials. This timely appeal challenges all aspects of the district court's order other than its dismissal of the plaintiffs' First Amendment claims, which claims are no longer being pursued.

## II.  ANALYSIS

### A.  Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence

and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.   Local-act claim**

The plaintiffs' first argument is that the MSRA violates the Michigan Constitution because it was enacted without satisfying the constitutional requirements for local legislation. Article 4 prohibits the Legislature from enacting any "local or special act in any case where a general act can be made applicable." Mich. Const. art. 4, § 29. When the Legislature passes a local act, Article 4 requires that it be "approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." *Id*. The defendants argue that this provision does not apply to the MSRA because the Michigan Constitution specifically addresses the issue of education and gives the Legislature the ultimate authority to regulate public schools. They further contend that, in any event, the MSRA is not a local act. The district court agreed with the defendants' second argument, concluding that because the MSRA is an act of general application, Article 4 did not require a two-thirds majority vote in the state Legislature or referendum approval by the citizens of Detroit.

To support their position that Article 4 does not apply to matters of public education, the defendants rely upon the principle that where legislation deals with a subject matter of statewide concern, the act is not a "local or special act," even though its effects might be limited to a particular geographic location. In *Hart v. County of Wayne*, 240 N.W.2d 697 (Mich. 1976), the Michigan Supreme Court held that legislation requiring Wayne County to supplement the salaries of Recorder's Court judges serving within the county was not

a difference in evaluating the legal parallels between *Mixon* and the present case.

The plaintiffs also contend that Ohio's municipal school-governance legislation is materially different from the MSRA, because the Cleveland mayor was authorized to appoint all of the nine school board members, whereas the MSRA allows the state superintendent of public instruction or that officer's designee to be a member of the school reform board. This distinction, however, does not alter the nature of the plaintiffs' Voting Rights Act challenge, nor does it legally differentiate the present case from *Mixon*.

For all of the reasons discussed above, we conclude that the plaintiffs have failed to state a claim under § 2 of the Voting Rights Act. As a result, the district court did not err in granting summary judgment to the defendants on this claim.

**D.   Fourteenth and Fifteenth Amendment claims**

The plaintiffs' final challenge to the MSRA involves a variety of claims brought under the Fourteenth and Fifteenth Amendments to the United States Constitution and similar provisions of the Michigan Constitution. They first contend that the MSRA constitutes racially discriminatory legislation in violation of the Fourteenth Amendment, the Fifteenth Amendment, and the Michigan Constitution. Their second claim is that the MSRA violates the Equal Protection Clauses of the Fourteenth Amendment and the Michigan Constitution because it prevents the residents of Detroit from voting for their school board members, and because it prohibits former school board members from serving on the Reform Board. Although the plaintiffs' complaint also included a due process challenge to the MSRA, they have not pursued this claim on appeal.

Under the Equal Protection Clause of the Fourteenth Amendment, courts apply strict scrutiny to statutes that involve suspect classifications or infringe upon fundamental rights. *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (explaining

which the elected board members can either implement or not, constitutes a hybrid elective-appointive system.

With respect to the plaintiffs' attempt to distinguish *Mixon*, they correctly recognize that the Cleveland School District was operating under a federal consent decree when the Ohio Legislature enacted the challenged legislation. The federal district court had ordered the state board of education and the state superintendent of public instruction to "assume immediate supervision and operational, fiscal, and personnel management of the District" on March 3, 1995. *Mixon*, 193 F.3d at 395 (citation omitted). More than three years later, "the district court ordered the State Superintendent to return control of the Cleveland schools to the City of Cleveland as of September 9, 1998." *Id*. The Ohio Legislature passed the statute that established "municipal school districts" on July 22, 1997. *Id*. As this court explained in *Mixon*,

> [t]he legislation defines a municipal school district as "a school district that is or has ever been under a federal court order requiring supervision and operational, fiscal, and personnel management of the district by the state superintendent of public instruction." Upon the statute's enactment, the Cleveland School District fell within the statute's definition and became a municipal school district.

*Id*. (internal citations omitted).

The plaintiffs seek to attach significance to the fact that the Cleveland School District was under a federal court order immediately before the Ohio legislation at issue in *Mixon* was enacted. They fail to acknowledge, however, that the Cleveland School District would have returned to an elected system of governance if the Ohio Legislature had not passed the "municipal school district" statute. As a result, the history that preceded Cleveland's transition from an elected school board to one appointed by the mayor is a distinction without

subject to the local-act provision of Michigan's Constitution. *Id*. at 703-04. The court explained that because the Recorder's Court is "a state court performing a state function, not a local function," the legislation at issue was not a local act. *Id*. at 703. In addition, the court held that the specific provisions in Michigan's Constitution governing the state-court system prevailed over the general subject of local acts. *Id*. at 703-04 & n.7.

The defendants seek to apply *Hart*'s principles to the present case, noting that Michigan's Constitution provides that "[t]he legislature shall maintain and support a system of free public elementary and secondary schools as defined by law." Mich. Const. art. 8, § 2; *see MacQueen v. City Comm'n of Port Huron*, 160 N.W. 627, 629 (Mich. 1916) ("Fundamentally, provision for and control of our public school system is a State matter, delegated to and lodged in the State legislature by the Constitution in a separate article entirely distinct from that relating to local government."). But the defendants' position requires them to distinguish *Common Council of the City of Detroit v. Engel*, 168 N.W. 462 (Mich. 1918), where the court held that legislation limiting the permissible interest rate on school bonds for the Detroit public schools violated the local-act requirement. *Id*. at 464-65. The *Engel* court recognized that the state Constitution vested the Legislature with primary authority over all educational matters, but it nevertheless concluded that "all powers of the legislature, whatever they may be, are, under and by virtue of the Constitution, subject to general constitutional mandates and limitations imposed on legislation without reservation." *Id*. at 464.

According to the defendants, *Hart* effectively overruled *Engel*, or at least undermined the reasoning upon which *Engel* was based. The problem with this argument, however, is that *Hart* discussed *Engel* without overruling it. Instead, the court noted that "*Engel* is not the sole authority on exempting a general subject of legislation from the local act referendum requirement where the challenged statute pertains to a

particular location." *Hart*, 240 N.W.2d at 701 (recognizing that the Michigan Supreme Court had previously held that an act dealing with the construction and operation of a bridge located at a particular site, and acts concerning matters of health, did not implicate the local-act provision because the statutes in such cases relate to matters affecting the entire state). The court also distinguished the facts of *Engel* from the statute it was examining by concluding: "More importantly, funding of the judiciary is a unique situation presenting overriding state concerns. *Engel* does not apply in the instant case." *Id.*

Given that *Engel* has not been overruled, and that both the present case and *Engel* involve the state Legislature's control over educational matters, *Engel* is potentially applicable to the present case. The defendants' contention that *Hart* effectively overruled *Engel* is an argument that the Michigan Supreme Court might one day see fit to address. But we have no authority to do so in light of the fact that *Hart* distinguished rather than rejected *Engel*, thus leaving *Engel* as good law. *Allstate Ins. Co. v. Thrifty Rent-a-Car Sys. Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (recognizing that federal courts in diversity cases "apply state law in accordance with the controlling decisions of the state supreme court"); *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999) ("A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.").

Because legislation that deals with public education is not automatically exempt from Article 4, we must determine whether the MSRA is a local act. Neither side disputes that the MSRA affects only the DPS at the present time. The MSRA, however, does not mention Detroit by name, but rather defines a "qualifying school district" in terms of the number of enrolled students.

The justifications for the more onerous requirements of § 5 support interpreting the two sections differently. *Bossier Parish II* recognized this principle and identified a situation in which a plaintiff might prevail under § 2, even though preclearance would be available to the local jurisdiction under § 5. As noted above, however, *Bossier Parish II* did not involve a situation with parallels to the present case. Requiring transitions from elected to appointed systems to be preapproved under § 5, while declining to permit such changes to be subject to challenge under § 2, does not conflict with either the holding or the dicta in *Bossier Parish II*.

### 2.   **Mixon*'s applicablity to the present case*

Several of the groups that filed *amicus* briefs supporting the plaintiffs argue that *Mixon* is distinguishable from the present case. The ACLU, for example, contends that, unlike *Mixon*, the MSRA established "a hybrid elective-appointive system—unique to Michigan—with the elected school board serving an advisory role to the newly created appointed reform board." Other *amici* maintain that *Mixon* is not applicable because it involved a situation where a federal district court had transferred control of the affected school district from an elected school board to the state superintendent of schools. We find neither of these arguments to have merit.

The MSRA allows the elected members of the Detroit school board to serve in a voluntary, advisory capacity until their terms of office expire. But they have no authority to act, and nothing compels the Reform Board to heed their advice. Moreover, all of their duties have been transferred to the Reform Board, and the elected board members are not entitled to any compensation or reimbursement for any counseling that they might provide. Finally, the MSRA does not contain any provision that would replace the elected board members as their terms of office expire. The plaintiffs are simply mistaken in arguing that this purely voluntary, advisory role,

between §§ 2 and 5" that the similar language in both sections establishes, and recognizing that § 5 applies to judicial elections, the Supreme Court stated:

> If § 2 did not apply to judicial elections, a State covered by § 5 would be precluded from implementing a new voting procedure having discriminatory effects with respect to judicial elections, whereas a similarly discriminatory system already in place could not be challenged under § 2.   It is unlikely that Congress intended such an anomalous result.

*Chisom*, 501 U.S. at 401-02.  The problem with applying this reasoning to the plaintiffs' contention that § 2 should apply to changes from elective to appointive systems is that, even in political subdivisions that must comply with § 5, appointive systems of office are permissible.  Section 5 thus becomes an issue only if a school district subject to § 5 attempts to transition from an elected system to an appointive system.

The plaintiffs argue, however, that because §§ 2 and 5 contain similar language, § 2 *ipso facto* also covers such transitions.  We disagree with this reasoning.  Section 5 applies only in "areas where voting discrimination has been most flagrant," whereas § 2 prohibits "voting discrimination in any area of the country where it may occur."  *South Carolina v. Katzenbach*, 383 U.S. 301, 315-16 (1966).  The Supreme Court upheld the constitutionality of § 5 in *Katzenbach*, noting that even though the burden of gaining preclearance "may have been an uncommon exercise of congressional power, . . . exceptional conditions can justify legislative measures not otherwise appropriate."  *Id*. at 334-35.  Specifically, § 5 was designed to respond to the use of "the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees."  *Id*. at 335.

As an initial matter, the parties disagree about whether we should focus on the original or the amended version of the MSRA.  Unlike the original act, which contained several provisions that could be construed to limit the MSRA's applicability to Detroit, the amended version clarifies that if future districts reach the requisite size, they too will be subject to the MSRA.  This difference is crucial, because where a statute includes a population classification and contains provisions indicating that it will have no application to localities that reach the specified population in the future, the statute must comply with the local-act requirement. *Mulloy v. Wayne County Bd. of Supervisors*, 225 N.W. 615, 616-17 (Mich. 1929) (holding that because the statute's provisions prevented it from having a prospective application to counties that reached the required population, "[n]o other conclusion can be reached than that it is local legislation applicable to Wayne county only"); *but see City of Dearborn v. Wayne County Bd. of Supervisors*, 266 N.W. 304, 305 (Mich. 1936) (noting that legislation is *not* local if the statute applies whenever the specified population is reached and if a reasonable relationship exists between the population classifications and the subject matter).

The plaintiffs contend that the amendments to the MSRA, which were made after this lawsuit was filed, are post-litigation efforts to mask the MSRA's true intent to limit its application to Detroit.  As such, they argue that the original version of the MSRA reveals the legislative intent.  Both the Michigan courts and this court, however, have recognized that amendments are often intended to clarify the original intent of legislation, rather than to remove aspects of a statute that would render it invalid.  *Petition of Detroit Edison Co.*, 87 N.W.2d 126, 130 (Mich. 1957) (noting that "if uncertainty exists as to the meaning of a statute," an amendment might be "adopted for the purpose of making plain what the legislative intent had been all along from the time of the statute's original enactment"); *United States v. Tapert*, 625 F.2d 111, 121 (6th Cir. 1980) ("An amendment to an existing statute is not an acknowledgment by Congress that the original statute

is invalid. It is a common and customary legislative procedure to enact amendments strengthening and clarifying existing laws."). We will therefore concentrate on the amended version of the MSRA to determine whether its population classification renders it subject to Article 4's requirements.

The Michigan Supreme Court has squarely held that where a particular act applies only to cities or counties with a specified population, that statute is not a local act if a reasonable relationship exists between the population classification and the purpose and subject matter of the legislation. *Irishman's Lot, Inc. v. Cleary*, 62 N.W.2d 668, 670-71 (Mich. 1954) (holding that a statute prohibiting the purchase and sale of automobiles on Sundays in counties with more than 130,000 people was not a local act because a reasonable relationship existed between the restriction and the population); *Mulloy v. Wayne County Bd. of Supervisors*, 225 N.W. 615, 616 (Mich. 1929) ("If it is a reasonable and logical basis of classification, considering the subject of legislation, unquestioningly a specified population may be made the test of the applicability of a general legislative act; and under such conditions the act will not be construed to be invalid as local legislation.").

The absence of a reasonable relationship between the population classification and the subject matter of the legislation, however, renders the statute a local act that must satisfy the requirements of Article 4. *Avis Rent-a-Car Sys., Inc. v. Romulus Cmty. Sch.*, 254 N.W.2d 555, 559-60 (Mich. 1977) (holding that legislation allowing the government to impose taxes on concessions at airports located in counties of more than 1,000,000 inhabitants was a local act, because "[w]e do not see a reasonable relationship between the withdrawing of a tax exemption from airport concessions and the size of the county where the airport is located").

Applying these principles to the present case, we conclude that a reasonable relationship exists between the size of a school district and the perceived shortcomings that led the

nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election"); *Mixon*, 193 F.3d at 403 ("Although plaintiffs have a fundamental right to vote in elections before them, there is no fundamental right to elect an administrative body such as a school board, even if other cities in the state may do so."). The comparison that the plaintiffs seek to make between their ability to elect school board members before the MSRA was enacted and their inability to do so under the MSRA thus involves circular reasoning. Specifically, they appear to complain about lacking the right to do something (elect school board members) that they never had a fundamental right to do. *See Sailors*, 387 U.S. at 109 ("Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs.").

In this respect, the rationale of *Bossier Parish II* actually counters the plaintiffs' argument, because the Supreme Court noted that in § 2 challenges alleging the abridgment of the right to vote, a comparison must be made between the status quo and a hypothetical alternative: "If the *status quo* 'results in [an] abridgment of the right to vote' or 'abridge[s] [the right to vote]' relative to what the right to vote *ought to be*, the status quo itself must be changed." *Bossier Parish II*, 528 U.S. at 334 (emphasis and brackets in original). The plaintiffs complain about the status quo imposed by the MSRA, but they have no authority for their implied conclusion that they *ought to have* the right to elect members of the Detroit school board. *Sailors* clearly negates the existence of any such right.

The inability to bring a Voting Rights Act claim based upon the existence of an appointive system where an elected system would be preferable to the residents of the affected political subdivision also undermines the plaintiffs' reliance upon *Chisom*'s dicta that draws parallels between §§ 2 and 5. Specifically, after commenting on "[t]he close connection

569-70 (1969) (concluding that a shift from an elected to an appointive office is covered by § 5). Although § 5 does not apply to the state of Michigan, the plaintiffs read *Presley* and *Allen* in conjunction with the language in *Bossier Parish II* to support their contention that *Mixon* must be overruled.

The plaintiffs' argument, in our opinion, is without merit. In the first place, *Bossier Parish II* did not involve appointive systems. Nor did it address the complete denial of the right to vote that the plaintiffs claim is implemented by the MSRA. *Bossier Parish II*, 528 U.S. at 338 n.6 (explaining that "our holding today does not extend to violations consisting of an outright 'denial' of an individual's right to vote, as opposed to an 'abridgment' as in dilution cases"). The fact that a plaintiff who brings a vote-dilution claim can succeed under § 2 by demonstrating a discriminatory effect, even though a § 5 action would fail because of the lack of retrogression, is simply not relevant to whether § 2 applies to appointed offices in political subdivisions not subject to § 5.

For these reasons, *Bossier Parish II* is not applicable to the present case, and *Mixon* remains the binding precedent of this court. *Mixon*'s rejection of a Voting Rights Act claim that is indistinguishable from the plaintiffs' allegations, in a factual context that is nearly identical to the present case, therefore controls the outcome of the plaintiffs' § 2 challenge to the MSRA.

Moreover, aside from the fact that *Mixon* rejected a claim that § 2 applies to a shift from an elective to an appointive system of selecting school board members, several additional problems exist with the plaintiffs' argument under § 2. Most importantly, citizens do not have a fundamental right to elect nonlegislative, administrative officers such as school board members. *Sailors v. Kent Bd. of Educ.*, 387 U.S. 105, 108 (1967) (holding that voters did not have a right to elect the members of the county school board, who were chosen by delegates from the local school boards, noting that "[w]e find no constitutional reason why state or local officers of the

Michigan Legislature to enact the MSRA. The Legislature's determination that first-class school districts present unique problems because of their size, and that an appointed school board would be better equipped to address those challenges than would an elected board, is not unreasonable. *Irishman's Lot, Inc.*, 62 N.W.2d at 671 ("When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed or to other legitimate proof, that the action is arbitrary.") (quoting *Borden's Farm Prods. Co., Inc., v. Baldwin*, 293 U.S. 194, 209 (1934)).

In *Lucas v. Board of County Road Commissioners*, 348 N.W.2d 660 (Mich. Ct. App. 1984), the Michigan Court of Appeals held that a statute permitting the chief executive officer of a county with more than 1,500,000 residents to remove incumbent road commissioners and fill the vacancies was not a local act. *Lucas*, 348 N.W.2d at 666. The court explained that "[b]ecause densely populated counties such as Wayne County present problems of governmental management and control different in kind, quality, and magnitude from those faced by other counties, [the challenged act] is not unconstitutional as local legislation." *Id*. Although *Lucas* involved road commissioners rather than school-board members, the rationale of *Lucas* is fully applicable to the present case.

The dividing line between school districts with student populations that are so large that they might reasonably necessitate the transition from an elective to an appointed school board and those districts where an elected school board can effectively address the school system's needs is undoubtedly somewhat fluid. But the absence of a clear dividing line does not render the Legislature's decision arbitrary, because "[o]nce the validity of a population factor is recognized, the Legislature's choice as to where to draw the

line, unless patently arbitrary, must be upheld." *Id.* In addition, the MSRA defines a "qualifying school district" as "a school district of the first class," and the School Code provides that school districts with at least 100,000 enrolled students are first-class school districts. Mich. Comp. Laws §§ 380.371, 380.402. This designation of first-class school districts predated the enactment of the MSRA, with an even higher 120,000 student enrollment required for classification as a first-class school district in the past. The Michigan Legislature thus recognized the unique problems and challenges that a district of that size presents even before enacting the MSRA, and treated these districts differently.

Regardless of the relationship between the size of a school district and the asserted need for appointed rather than elected school boards, the plaintiffs insist that the MSRA is invalid because the Legislature enacted it solely to address the perceived shortcomings of the DPS. According to the plaintiffs, the defendants cannot maintain that the MSRA is a law of general application while simultaneously justifying it as necessary to address the problems of Detroit's schools. This argument, however, fails to recognize that even though the circumstances in a particular city or county might lead the Legislature to enact a statute, the resulting legislation can nevertheless be general if it contains population classifications that are reasonably related to the subject matter at issue. Indeed, Detroit's problems may be indicative of the unique challenges that all large urban school districts confront, thus suggesting that Detroit serves as only the current example of the reason to treat first-class school districts differently.

The plaintiffs also rely upon the Michigan Supreme Court's decision in *Attorney General ex rel. Dingeman v. Lacy*, 146 N.W. 871 (Mich. 1914), where the court explained that the state Legislature could not mask its intent to enact local legislation simply by using population classifications rather than naming a particular county:

Court in *Bossier Parish II* adhered to *Beer*, holding that "§ 5 does not prohibit preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose." *Bossier Parish II*, 528 U.S. at 341.

This holding was based upon the Court's conclusion that § 5's preclearance requirements are not identical to § 2's prohibition against voting practices with a discriminatory effect. *Id.* at 333-34. Clarifying the meaning of § 5 preclearance, the Court noted that in the vote-dilution context,

[preclearance] does not represent approval of the voting change; it is nothing more than a determination that the voting change is no more dilutive that what it replaces, and therefore cannot be stopped in advance under the extraordinary burden-shifting procedures of § 5, but must be attacked through the normal means of a § 2 action.

*Id.* at 335.

The plaintiffs argue that the Court's recognition in *Bossier Parish II* that § 2 is broader than § 5 in the context of vote-dilution cases casts doubt upon the reasoning in *Mixon*, because plaintiffs who live in jurisdictions subject to § 5's preclearance requirements can bring § 2 but not § 5 challenges to changes in voting systems that have an alleged discriminatory effect, even though no retrogression exists. In particular, the plaintiffs focus on *Mixon*'s comment that "[t]he fact that Section 5 is limited to certain jurisdictions implies that Congress intended to allow other jurisdictions to change from an elective to an appointive system without facing challenges under the Voting Rights Act." *Mixon*, 193 F.3d at 408. According to the plaintiffs, this reasoning is no longer valid after *Bossier Parish II*. They note that the Supreme Court has recognized that changes from elective to appointive systems are subject to § 5. *Presley v. Etowah County Comm'n*, 502 U.S. 491, 503 (1992) (holding that "§ 5 applies to changes . . . affecting the creation or abolition of an elective office"); *Allen v. State Bd. of Elections*, 393 U.S. 544,

judges to be indifferent to popular opinion." *Chisom*, 501 U.S. at 401, 404.

As the plaintiffs recognize, "a prior published opinion of this court is binding unless either an intervening decision of the United States Supreme Court requires modification of the prior opinion or it is overruled by this court sitting en banc." *United States v. Roper*, 266 F.3d 526, 530 (6th Cir. 2001). The plaintiffs argue, however, that the Supreme Court's decision in *Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000) (*Bossier Parish II*), undermines *Mixon*'s reasoning. They also contend that *Mixon* is factually distinguishable from, and thus not directly applicable to, the present case. We will address both of these arguments below.

### 1. **Bossier Parish II***'s impact on* **Mixon**

*Bossier Parish II* dealt with § 5 of the Voting Rights Act. Section 5, which applies only to specified jurisdictions with a history of discriminatory voting practices, requires preclearance of any changes that a covered political subdivision makes to "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c. Preclearance is available from either the Attorney General of the United States or the United States District Court for the District of Columbia, but only if the covered jurisdiction "demonstrate[s] that the proposed change 'does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.'" *Bossier Parish II*, 528 U.S. at 328 (quoting 42 U.S.C. § 1973c).

In *Beer v. United States*, 425 U.S. 130 (1976), the Supreme Court held that a discriminatory "effect" for the purpose of § 5 exists only if the change is "retrogressive." *Id.* at 141 ("[T]he purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."). The

> [A] classification by population can never be sustained where it is, as in the case at bar, a manifest subterfuge. The act under consideration might with equal propriety have been limited in its operation by its title to the county of Wayne. Its "general" character is not established by the use of other words which mean the same thing.

*Lacy*, 146 N.W. at 875. But reliance upon this language is misplaced in light of several subsequent Michigan Supreme Court decisions. In *Sullivan v. Graham*, 57 N.W.2d 447, 449 (Mich. 1953), for example, the court explained that "we have to a material degree departed from the reasoning in . . . [*Lacy*] in respect to restrictions in statutes of applicability to counties of a designated total of population." Furthermore, although the MSRA applies only to Detroit at the present time, it contains language of general applicability. The fact that other school districts might never become first-class school districts does not render the MSRA a local act. *City of Dearborn v. Bd. of Supervisors*, 266 N.W. 304, 306 (Mich. 1936) ("The probability or improbability of other counties or cities reaching the statutory standard of population is not the test of a general law.").

As their final argument on this local-act issue, the plaintiffs contend that the defendants have failed to demonstrate that any reasonable relationship exists between the size of a school district and the need for an appointed rather than an elected school board. This contention challenges the basis for the Michigan Legislature's belief that an appointed school board would be able to address the problems of the DPS—and of large school districts in general—more effectively than an elected school board. The record reveals several reasons, however, that support a finding that a reasonable relationship exists. Prior to enacting the MSRA, for example, the Review Panel suggested that fundamental changes needed to be made at the DPS, and the one-year evaluation of the DPS's progress in achieving the panel's recommendations noted that the structure of the DPS had prevented progress from occurring in certain areas. These reports support a conclusion that

changes in the DPS's governing structure, such as an appointed rather than an elected school board, were needed.

Although the Review Panel focused exclusively on the DPS, a study prepared by the Michigan House Legislative Analysis Section discussed the arguments favoring and opposing the MSRA in more general terms. In particular, the analysis noted that the MSRA was modeled in part after the Chicago School District's reform efforts, which consisted of replacing an elected school board with an appointed board. Chicago's public schools achieved "higher scores on standardized tests, better attendance, higher graduation rates, and lower dropout rates" following the transition to an appointed school board. The Review Panel's recommendations and the success that Chicago experienced after reforming its school system support the reasonableness of the Michigan Legislature's determination that an appointed school board would be beneficial in large school districts.

For all of the preceding reasons, we conclude that the MSRA is not a local act, and was therefore not required to be enacted pursuant to the provisions set forth in Article 4. Accordingly, the MSRA does not violate that portion of the Michigan Constitution, and the district court did not err in granting summary judgment to the defendants on the plaintiffs' local-act challenge.

## C.   Voting Rights Act claim

The plaintiffs' second contention is that the MSRA conflicts with § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a). According to the plaintiffs, the MSRA violates § 2 because it denies Detroit's voters the right to elect their school board, while allowing

other Michigan citizens to continue to vote for their school board members.

Section 2, unlike other federal legislation that prohibits racial discrimination, does not require proof of discriminatory intent. Instead, a plaintiff need show only that the challenged action or requirement has a discriminatory effect on members of a protected group:

> A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id*. § 1973(b); *see Mixon v. Ohio*, 193 F.3d 389, 407 (6th Cir. 1999) ("Although Plaintiffs must prove discriminatory intent to prevail in an Equal Protection Clause or Fifteenth Amendment claim, Section 2 of the Voting Rights Act requires only a showing of discriminatory effect.").

In *Mixon*, this court held that § 2 applies only to elective systems, not to appointive offices. *Mixon*, 193 F.3d at 407-08. The plaintiffs in *Mixon* challenged an Ohio statute that changed the process for selecting Cleveland School Board members from an elective to an appointive system, legislation that had precisely the same effect as does the MSRA in the present case. *Mixon* relied upon dicta in *Chisom v. Roemer*, 501 U.S. 380 (1991), to reach its conclusion that § 2 does not apply to appointive offices. *Mixon*, 193 F.3d at 407. The Supreme Court in *Chisom* held that state judicial elections are subject to the provisions of § 2, but noted that "Louisiana could, of course, exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed, and, in that way, it could enable its